Gerald P. Urbach
Texas SBN 20412000
gurbach@hhdulaw.com
Russell W. Mills
Texas SBN 00784609
rmills@hhdulaw.com
Jason M. Katz
Texas SBN 24038990
jkatz@hhdulaw.com
HIERSCHE, HAYWARD, DRAKELEY & URBACH, P.C.
15303 Dallas Parkway, Suite 700
Addison, TX 75001
Ph: 972-701-7000
Fax: 972-701-8765

**ATTORNEYS FOR HSM LAKESHORE, LTD.**

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HSM LAKESHORE, LTD.** | § | |
| | § | |
| | § | **Case No. 09-47653-rfn-11** |
| **Debtor.** | § | |

## DEBTOR'S DISCLOSURE STATEMENT

## ARTICLE I: INTRODUCTION

**A.**     **General**

    1.    HSM Lakeshore, Ltd. ("Debtor") provides this Disclosure Statement to all of the Debtor's[1] known creditors entitled to same pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq. (the "Code"). The purpose of this Disclosure Statement is to provide creditors of the Debtor with such information as may be deemed material, important and necessary in order for the creditors to make a reasonably informed decision in exercising the right to vote on the Plan presently on file with the Bankruptcy Court and described below.

---

1    Unless otherwise noted, all capitalized terms herein shall have the same meaning as in the Plan.

2.	A copy of the Plan accompanies this Disclosure Statement as Exhibit "A" and is incorporated herein by reference. The definitions found in Article 1.0 of the Plan are incorporated herein by reference and should be referred to in reading and analyzing the Plan and this Disclosure Statement.

3.	**NO REPRESENTATIONS CONCERNING THE DEBTOR, INCLUDING THOSE RELATING TO THE FUTURE BUSINESS OPERATIONS, THE VALUE OF ASSETS, ANY PROPERTY OR CREDITOR'S CLAIMS INCONSISTENT WITH ANYTHING CONTAINED HEREIN HAVE BEEN AUTHORIZED.** Any representations or inducements made to secure your acceptance or rejection, which are other than as contained in this Disclosure Statement, should not be relied upon by you in arriving at your decision.

4.	The financial information contained herein has not been subject to an audit, certified or otherwise. **FOR THIS REASON AND BECAUSE OF FINANCIAL CONSTRAINTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACIES, ALTHOUGH DEBTOR HAS MADE AN EFFORT TO PRESENT SUCH INFORMATION FAIRLY AND ACCURATELY.** Additional information can be found in Debtor's Statement of Financial Affairs and its Schedules of Assets and Liabilities and its operating reports on file with the Bankruptcy Court.

5.	The Debtor proposes the Plan which accompanies this Disclosure Statement. **THE DEBTOR RECOMMENDS A VOTE "FOR ACCEPTANCE" OF THE PLAN.**

B.	**Manner of Voting**

1.	All creditors entitled to vote on the Plan may cast votes for or against the Plan by completing, dating, signing and causing the Ballot Form accompanying this Disclosure Statement to

be received no later than 4:00 p.m., prevailing central time, on _____ ___, **2010,** at the following address: Gerald P. Urbach, Hiersche, Hayward, Drakeley & Urbach, 15303 Dallas Parkway, Suite 700, Addison, Texas 75001.

**C.** **Confirmation of Plan**

1.    <u>Solicitation of Votes</u>.  By the order entered on _____ ___, 2010, the Bankruptcy Court approved this Disclosure Statement in accordance with Section 1125 of the Bankruptcy Code.  This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtor and each creditor who has filed a proof of claim.  This Disclosure Statement is intended to assist creditors in evaluating the Plan and in determining whether to accept the Plan. **UNDER THE BANKRUPTCY CODE, YOUR VOTE FOR ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNLESS YOU RECEIVE A COPY OF THIS DISCLOSURE STATEMENT PRIOR TO OR CONCURRENTLY WITH SUCH SOLICITATION.**  The solicitation of votes on the Plan is governed by the provisions of Section 1125(b) of the Code, the violation of which may result in sanctions by the Court, including disallowance of the solicited vote and loss of the "safe harbor" provisions of Section 1125(e) of the Code.

2.    <u>Persons Entitled to Vote on the Plan</u>.  Only the votes of members of classes of claimants which are impaired under the Plan are counted in connection with confirmation of the Plan.

3.    <u>Hearing on Confirmation of the Plan</u>.  The Bankruptcy Court has set _____ _____, **2010** at ___:___ ___.m., for a hearing to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied.  Each creditor will receive either with this Disclosure Statement or separately, the Bankruptcy Court's Notice of Hearing on Confirmation of the Plan.  Any objections to confirmation

of the Plan must be filed in writing with the Bankruptcy Court and served upon Gerald P. Urbach and Jason M. Katz so as to be received by ____:___ ___.m. on _____ ___, **2010**, at the address noted in paragraph B above.

4.     <u>Acceptance Necessary to Confirm Plan</u>.  At the scheduled hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the impaired classes.  Under Section 1126 of the Code, an impaired class is deemed to have accepted the Plan if at least two-thirds in amount and more than one-half in number of claims of class members who have voted to accept or reject the Plan have voted for acceptance of the Plan.

5.     <u>Confirmation of Plan Without Necessary Acceptance</u>.  The Plan may be confirmed even if it is not accepted by all of the impaired classes if one of the impaired classes accepts it and the Bankruptcy Court finds the Plan does not discriminate unfairly against and is fair and equitable to the dissenting class.  This provision is set forth in Section 1129(b), a relatively complex provision of the Code.  This summary is not intended to be a complete statement of the law.  The Debtor may choose to rely upon this provision [Section 1129(b)] to seek confirmation of the Plan if it is not accepted by an impaired class or classes of creditors.

## ARTICLE II: DESCRIPTION OF THE DEBTOR AND STATUS OF THE CASE

1.     <u>Ownership Of The Debtor</u>.

The Debtor is a Texas limited partnership incorporated in April of 2009. The Debtor is owned by two limited partners and one general partner.  HSMCO, Inc. has a 99% limited partnership interest in the Debtor. HSM Lakeshore GP, LLC has a 1% limited partnership interest in the Debtor.  Devco Lakeshore GP, LLC is the general partner.  The case was filed on November 30, 2009.  Debtor's lender, BBVA Compass Bank (the "Bank"), sought to foreclose on Debtor's real property pre-petition and has filed a Motion to Lift the Automatic Stay which is pending before the Court.

2.    The Debtor And Its Market.

The Debtor is a real estate development company which is seeking to sell townhome lots, build and sell townhomes, and/or lease townhomes. Debtor's principal assets consist of 107 vacant lots available for sale or development and 18 completed or nearly completed townhomes, which Debtor sells to various builders who in turn sell them to ultimate purchasers. All of townhouses and townhouse lots are located on the west shoreline of Joe Pool Lake in the City of Grand Prairie, Dallas and Tarrant Counties, Texas and is known as Lakeshore Village. A homeowner's association ("HOA") has recently been formed. Prior to the formation of the HOA, the Debtor paid all HOA expenses in anticipation of the formation of the HOA. The Debtor currently has claims against the HOA for all expenses forwarded by the Debtor on behalf of the HOA.

3.    Debtor's Financial And Operational Difficulties.

The Debtor's business has been adversely impacted by the general economic downturn in the United States, which has caused sales of Debtor's lots to take longer to be sold and for less than originally contemplated. As of the date of the petition, Debtor is a party to a promissory note in the original principal amount of $6,475,000 dated July 15, 2009 in favor of Bank. Bank is the current holder of the Note. The Note is purportedly secured by a deed of trust which purports to grant the Bank a lien in certain of the Debtor's assets (specifically lots and townhomes located in Dallas and Tarrant County, Texas), any rents, royalties, profits, issues, revenue, income, other benefits derived from the Real Property and other assets including, without limitation, its cash from the sale of lots and townhomes from the Real Property and from the rental of townhomes (the Debtor is currently leasing two townhomes). The Debtor generates revenue to operate and pay its bills from selling lots and townhomes from the Real Property and from the rental of townhomes.

The Debtor agreed with the Bank on a minimum partial release price of $28,500 per lot before the Bank would allow the lot or townhome to be sold. The minimum partial release price is collected by the Bank and the Debtor retains everything above the minimum partial release price. The sale of lots declined due to the poor economy. The Bank had posted and was prepared to foreclose the loan. While not the sole factor, the threatened foreclosure was a precipitating factor in the Debtor's decision to file bankruptcy. Debtor borrowed considerable sums of money in order to develop the land that has not generated revenue necessary to service the debt. Debtor believes that sales volume could increase with a lower release price which would allow Debtor to lower the asking price for each lot or townhome.

4.      Debtor's Ability to Fund Reorganization, Its Financial Forecast And Its Business Plan.

Debtor intends to reorganize its business through a restructuring of the debt owing to the lender and continued sale of the lots and townhomes. The Debtor is actively marketing the 107 lots and 18 completed or nearly completed townhomes for sale. The Debtor will modify the release prices to 85% of the net proceeds of sales. This plan gives the Debtor time to sell lots while providing the Bank reasonable payments and adequate collateralization. The Debtor's financial forecast is attached hereto as Ex "B" and incorporated herein by reference. Exhibit "B" shows that Debtor will be able to service its plan obligations during the next 59 months. Debtor's financial forecast assumes the sale of one to three lots per month and one townhome every other month of the next 17 months (and then one townhome a month thereafter until all remaining units are sold).

5.      Funds Available.

As of January 31, 2010, the Debtor had approximately $8,196.22 in cash. Debtor is generating funds from rentals of some of the completed townhouse units. Debtor will have on hand funds paid for the New Partnership Interests.

6.    The Bankruptcy Filing and The Status Of The Bankruptcy Case.

On November 30, 2009, the Debtor filed its petition for relief under Chapter 11 of the United States Bankruptcy Code. Soon thereafter, the Debtor filed (a) an Application pursuant to 11 U.S.C. §§ 327, 328 & 329 and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure for an order authorizing the retention of Hiersche, Hayward, Drakeley & Urbach, P.C.; (b) a Motion For (I) Entry of Interim Order Authorizing Use Of Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Entry of Order Clarifying That Sales of Lots and Townhomes are in the Ordinary Course of Business and For Establishing Sales Procedures; and (c) a Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a) and 366 Prohibiting Utilities from Discontinuing, Altering, or Refusing Service, and Establishing Procedures for Determining Adequate Assurances of Payment.

On February 2, 2010, the Bank filed its motion for relief from the automatic stay. On February 12, 2010, the Debtor filed a response opposed to the Bank's motion to lift the automatic stay. The Bank's motion is currently set for hearing on March 24, 2010.

On February 4, 2010, the Court entered Orders (a) wherein it approved the sale of lots in the ordinary course and establishing sale procedures and (b) regarding the use of cash collateral allowing the Debtor to use cash collateral on certain terms. On February 5, 2010, the Court entered an order approving the Debtor's employment of HHDU. On February 10, 2010, the Court entered its Final Order Regarding the use of cash collateral allowing the Debtor to use cash collateral on certain terms. On February 19, 2010, the Court entered its Interim Order Granting Adequate Assurance To Utilities.

## ARTICLE III: THE PLAN'S RELIANCE ON HSM MYERS, LTD.

1.    HSM Myers, Ltd. is a partnership whose general partner is controlled by the same entity controlling the general partner of Debtor. In addition to this practical common control,

Debtor's debt to Bank is cross-collateralized with all of the real estate owned by Debtor and all of the real estate owned by HSM Myers, Ltd. serving as security for the Debt to the Bank. Because of the common secured creditor and the paucity of unsecured creditors in HSM Myers, Ltd., and without objection from the owners of either entity, Debtor's Plan substantively consolidates its assets and liabilities with those of HSM Meyers, Ltd. The substantive consolidation should provide sufficient cash flow to service all of the Debt and result in full payment to the creditors of Debtor and HSM Myers, Ltd. See Exhibit "B."

## ARTICLE IV: SELECTED SIGNIFICANT
## EXCERPTS FROM THE PLAN OF REORGANIZATION

The following is a brief summary of the Plan attached as Exhibit "A", and is qualified in its entirety by the full text of the Plan itself. The Plan, if confirmed, will be binding upon the Debtor and its creditors. All creditors are urged to read the Plan carefully. If and when the Plan is confirmed, the Debtor expects to be able to fully perform its obligations to all classes of creditors as set forth in the Plan through the operating revenues of the Debtor.

## CLASSIFICATION OF CLAIMS AND CURRENT PARTNERSHIP INTERESTS

2.1     The following is a designation of the Classes of Claims and Current Partnership Interests under this Plan. Administrative Expense Claims and Priority Tax Claims have not been classified and are excluded from the following classes in accordance with section 1123(a)(1) of the Bankruptcy Code. A Claim or Current Partnership Interest shall be deemed classified in a particular Class only to the extent that the Claim or Current Partnership Interest qualifies within the description of that Class. A Claim or Current Partnership Interest is in a particular Class only to the extent that the Claim or Current Partnership Interest is an Allowed Claim or Current Partnership Interest in that Class.

2.2     Claims and Current Partnership Interests:

Class 1 – Compass Bank Secured Claims

Class 2 – Secured Collin County Tax Claim

Class 3 – Secured Mansfield ISD Tax Claim

Class 4 – Secured Tarrant County Tax Claim

Class 5 – Secured Myers Meadow Tax Claims

Class 6 – Unsecured Claims

Class 7 – Current Partnership Interests

## ARTICLE 3

## IDENTIFICATION OF IMPAIRED CLASSES OF
## CLAIMS AND CURRENT PARTNERSHIP INTERESTS

3.1    <u>Impaired Classes of Claims and Partnership Interests</u>.  All Classes of Claims and Current Partnership Interests are impaired under the Plan.

3.2    <u>Impairment Controversies</u>.  If a controversy asserted in an objection to confirmation or other written pleading arises as to whether any Class of Claims or Current Partnership Interest is impaired under the Plan, the Bankruptcy Court shall determine such controversy after notice and a hearing and, if no such pleading is filed, then the identity of any impaired class will be conclusively determined by Section 3.1 of the Plan.

## ARTICLE 4

## TREATMENT OF ADMINISTRATIVE
## EXPENSES AND PRIORITY TAX CLAIMS

4.1    <u>Administrative Expenses</u>.  All Administrative Expenses against the Debtor shall be treated as follows:

(1)    Administrative Expenses Bar Date.  The holder of any Administrative Expense other than:  (i) a claim for professional fees and expenses for services rendered up to and including the Confirmation Date, (ii) a liability incurred and paid in the ordinary course of business by the Debtor; or (iii) an Allowed Administrative Expense, must file with the Bankruptcy Court and serve on the Debtor and its counsel, notice of such Administrative Expense within fifteen (15) days after the Confirmation Date.  Such notice must identify:  (i) the name of the holder of such Claim; (ii) the amount of such Claim; (iii) the basis of such Claim; and (iv) all written documentation supporting such Claim.  Failure to file this notice timely and properly shall result in such claim for the Administrative Expense being forever barred and discharged.

(2)    Allowance of Administrative Expenses.  An Administrative Expense with respect to which notice has been properly filed pursuant to Section 4.1(a) of the Plan shall become an Allowed Administrative Expense if no objection is filed within thirty (30) days after the filing and service of notice of such Administrative Expense.  If an objection is timely filed, the Administrative

Expense shall become an Allowed Administrative Expense only to the extent Allowed by Final Order.

        (3)     Payment of Allowed Administrative Expenses. Each holder of an Allowed Claim for an Administrative Expense other than a professional holding such a claim shall receive, at the Debtor's option: (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the tenth Business Day after such Claim becomes an Allowed Claim; (ii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost; or (iii) such other treatment as may be agreed to in writing by the holder of such Administrative Expense and the Debtor.

        (4)     Payment of Allowed Administrative Expenses To Professionals. Each holder of an Allowed Administrative Claim that is a professional shall be paid in full by Debtor HSM Devco, Ltd. and/or HSMCO on the date upon which an order approving such claim becomes final and nonappealable. Debtor HSM Devco, Ltd. and/or HSMCO, jointly and severally, are responsible for and shall make payment of such fees and expenses in full within ten(10) days of a final order approving such fees and expenses. Professional fees and expenses incurred after the Confirmation Date shall be the obligation of the Reorganized Debtor HSM Devco, Ltd. and HSMCO and shall be payable by the Reorganized Debtor HSM Devco, Ltd. and HSMCO promptly and without the need for application to or approval by the Bankruptcy Court. HSMCO's guarantee of payment of professional fees and expenses is reaffirmed by HSM Devco, Ltd. and HSMCO and shall continue until all of such fees and expenses are paid in full.

    4.2    <u>Unmatured Secured Tax Claims</u>. Each holder of an Unmatured Secured Tax Claim shall be paid by the Debtor at the time the Unmatured Secured Tax Claim becomes due and payable and in accordance with the Debtor's ordinary practice.

## ARTICLE 5

## TREATMENT OF CLAIMS AND CURRENT PARTNERSHIP INTERESTS

    5.1    <u>Class 1 – Compass Secured Claim</u>. The Compass Bank Secured Claim shall not exceed the amount of outstanding principal, interest and costs and fees allowable under 11 U.S.C. §506(b). Compass Bank shall receive on account of the Compass Bank Secured Claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the Effective Date, of at least the value of Compass Bank's interest in the Compass Bank Collateral. On the Effective Date, the Compass Notes will be amended, renewed, extended, restructured and modified on the terms herein and so as not to impair the priority of the Lien held by Compass Bank. Debtor will pay the Amended Compass Bank Notes in monthly principal and interest payments beginning the first day of the month following the Effective Date and continuing for fifty-six (56) additional months until paid in full. All interest-bearing obligations in this Section shall bear simple interest at a rate of 3% per annum. The Partial Release Price for the Lakeshore Lots shall be reduced to $20,000 per lot. The Partial Release Price for the Lakeshore Townshores is reduced to $31, 844 per townhouse. The Partial Release Price for the Myers Meadow Lots is $52,500. Upon confirmation, any and all defaults that have occurred under the Loan Documents shall be deemed cured.

5.2     Class 2 – Secured Collin County Tax Claims.  Collin County shall retain any lien it currently holds and will receive payment in full of its Allowed Collin County Tax Claim on the later of the Effective Date.

5.3     Class 3 – Secured Mansfield ISD Tax Claim.  Collin County shall retain any lien it currently holds and will receive payment in full of its Allowed Collin County Tax Claim on the later of the Effective Date.

5.4     Class 4 – Secured Tarrant County Tax Claims.  Collin County shall retain any lien it currently holds and will receive payment in full of its Allowed Collin County Tax Claim on the later of the Effective Date.

5.5.    Class 5 – Secured Myers Meadow Tax Claims.  Collin County shall retain any lien it currently holds and will receive payment in full of its Allowed Collin County Tax Claim on the later of the Effective Date.

5.6     Class 6 – Unsecured Claims.  Each holder of an Allowed Unsecured Claim will receive on account of its Allowed Unsecured Claim the full amount of their Allowed Unsecured Claim as shown in the projections attached to the Disclosure Statement.

5.7     Class 7 – Current Partnership Interests.  All Current Partnership Interests in the Debtor shall be canceled on the Effective Date and New Partnership Interests shall be issued to the New Partnership Owners making Partnership Contributions as provided in Paragraph 7.5 of the Plan.

## ARTICLE 6

## ACCEPTANCE OR REJECTION OF PLAN

6.1     Classes Entitled to Vote.  Each impaired Class of Claims and Current Partnership Interests shall be entitled to vote separately to accept or to reject the Plan.  Any unimpaired Class of Claims or Current Partnership Interests shall not be entitled to vote to accept or to reject the Plan. Classes 1, 2, 3, 4 and 5 are impaired and holders of such Allowed Claims therefore are entitled to vote on the Plan.

6.2     Class Acceptance Requirement.  A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan.  A Class of Partnership Interests shall have accepted the Plan if it is accepted by at least two-thirds (2/3) of the number of the Allowed Current Partnership Interests in such Class that actually have voted on the Plan.

6.3     Cramdown.  This Section shall constitute the Debtor's request, pursuant to section 1129(b)(1), that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) may not be met.

6.4 <u>Cure Payments and Release of Liability</u>. All cure payments that may be required by Bankruptcy Code Section 365(b)(1) under any executory contract or unexpired lease that is assumed, or assumed and assigned, under this Plan shall be made by the Debtor on or as soon as practicable after the Effective Date; provided, however, in the event of a dispute regarding the amount of any cure payments, the cure of any other defaults, the ability of the Debtor to provide adequate assurance of future performance, or any other matter pertaining to assumption or assignment, the Debtor shall make such cure payments and cure such other defaults and provide adequate assurance of future performance, all as may be required by Bankruptcy Code Section 365(b)(1), following the entry of a Final Order resolving such dispute. To the extent that a party to an assumed executory contract or unexpired lease has not filed an appropriate pleading with the Bankruptcy Court on or before the thirtieth (30th) day after the Effective Date disputing the amount of any cure payments offered to it by the Debtor, disputing the cure of any other defaults, disputing the promptness of the cure payments, or disputing the provisions of adequate assurance of future performance, then such party shall be deemed to have waived its right to dispute such matters.

## ARTICLE 7

## MEANS OF IMPLEMENTATION OF THE PLAN

7.1 The Debtor's Assets and Liabilities will be substantially consolidated with the assets and liabilities of HSM Myers, Ltd. Together, the assets of the combined entities will be sold over a period of fifty-seven (57) months and the proceeds of sale according to Debtor's projections will pay all Allowed Claims in the case, including the claim of Compass Bank.

7.2 On the Effective Date, the Reorganized Debtor shall assume all liabilities pursuant to this Plan.

7.3 On the Effective Date, all right, title, and interest in and to the Assets shall vest in the Reorganized Debtor.

7.4 The Reorganized Debtor shall have the powers and duties specified in this Plan together with all other powers of a Texas limited partnership. Such powers shall include, without limitation, the power to object to Claims, to administer Cash and Cash on Hand and to operate the business of the Reorganized Debtor subject only to any limitations imposed by the Plan. The Reorganized Debtor may operate without approval from the Bankruptcy Court.

7.5 The Reorganized Debtor shall own all Avoidance Actions and all Litigation Claims and shall have full power to institute, proceed to trial and appeal, settle or dismiss any Avoidance Action or Litigation Claim without approval from the Bankruptcy Court.

7.6 The New Partnership Interest Owner will purchase all of the New Partnership Interests in the Reorganized Debtor. The Total New Partnership Interest Owner Contribution is the amount shown on the Exhibit "B" to the Disclosure Statement. The Total New Partnership Interest Owner Contribution shall be used by the Debtor, to the extent deemed by the Debtor as necessary, to fund its continuing operations and Plan obligations. The Debtor will determine, on a monthly basis,

the amount of the Monthly New Partnership Interest Owner Contribution necessary for operations during that month and, on or before the 20th of each calendar month, will request such amount from the New Partnership Interest Owner. The New Partnership Interest Owner shall pay the Monthly Partnership Interest Owner Contribution to the Debtor on or before the 5th of each calendar month. Except upon the express written consent of the New Partnership Interest Owner, the Monthly New Partnership Interest Owner Contribution shall not exceed the previous month's Monthly New Partnership Interest Owner Contribution by ten percent (10%).

7.7     The New Partnership Interest Owner shall act as the general partner of the Debtor and shall have all of the duties, responsibilities, and powers of a general partner under Texas law.

7.8     Confirmation of the Plan shall be deemed to constitute a permanent injunction against maintenance or commencement of any action against Debtor arising out of any events occurring prior to the filing of this case and all holders of Claims against Debtor are permanently enjoined with respect to such Claims:  (a) from commencing or continuing any action or proceeding of any kind with respect to any such Claim against the Reorganized Debtor and/or the Assets; (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Assets and/or the Reorganized Debtor; (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Assets and/or the Reorganized Debtor; (d) from asserting any right of subrogation or recoupment of any kind against any obligation due the Debtor or the Reorganized Debtor; and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and all Claims and causes of action held by all Entities against the Debtor and the Reorganized Debtor are released and discharged except the obligations of the Reorganized Debtor pursuant to the provisions of the Plan; provided, however, that each holder of a Contested Claim may continue to prosecute its proof of Claim in the Bankruptcy Court and all holders of Claims and Partnership Interests shall be entitled to enforce their rights under the Plan and any agreements executed or delivered pursuant to or in connection with the Plan.

7.9     The Reorganized Debtor shall:  (i) be solely responsible for pursuing and/or settling all causes of action owned by the Reorganized Debtor and for distribution of all cash distributions contemplated by the Plan; (ii) have the right and power to enter into any contract or agreements binding the Reorganized Debtor in connection with the performance of its duties; (iii) have power to issue or arrange for the issuance of its Partnership Interests to New Partnership Owners; (iv) have power to borrow funds and/or obtain investors and/or sell or encumber its real estate for valid business purposes including funding any cash obligations pursuant to the Plan, funding expansion of Debtor's business as contemplated by Debtor's business plans submitted in support of confirmation of the Plan; (v) have power to do all acts contemplated by the Plan; and (vi) have sole discretion to settle or compromise any claim, cause of action, chose-in-action or litigation and settle any such claim, cause of action, chose-in-action or litigation, without approval of the Bankruptcy Court.

7.10     Subject to the following, the Debtor reserves the right to revoke and withdraw this Plan before the entry of the Confirmation Order. If the Debtor revokes or withdraws this Plan, or if confirmation of this Plan does not occur, then this Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the

Debtor or to prejudice in any manner the rights of the Debtor, or person in any further proceedings involving the Debtor or to provide the basis for any claim against Debtor.

7.11   The holder and beneficiary of the Guaranty Obligations is hereby enjoined from: (a) commencing or continuing in any manner any action, proceeding or lawsuit against the Guarantors based on the Guaranty Agreements, or (b) enforcing, attaching, collecting or recovery on account of any judgment, award, decree or other against the Guarantors or their respective assets or property on account of the Guaranty Obligations; provided, however, that: (a) such injunction shall automatically terminate if the Reorganized Debtor defaults in the payment of the Amended Compass Bank Notes in accordance with this Plan; and (b) the Reorganized Debtor shall not be deemed in default under this Plan in respect of the Guaranty Obligations until the Reorganized Debtor has been given 30 days written notice of default and an opportunity to cure such default during such 30 day period. In addition, the holder of the Guaranty Obligations will be required to exhaust all of its remedies against the Compass Bank Collateral including but not limited to foreclosing and selling the Compass Bank Collateral in a commercially reasonable manner before pursuing the Guarantors.

## ARTICLE V: FINANCIAL INFORMATION REGARDING DEBTOR

Debtor's Statement of Financial Affairs, detailed schedules of assets and liabilities, and amendments thereto, and the periodic Operating Reports and interim statements required to be filed by the Bankruptcy Court, have been filed with the Court and are incorporated in this Disclosure Statement. In addition, attached to the Disclosure Statement as Exhibit "B" is Debtor's projections for operations after consolidation with HSM Meyers, Ltd.

## ARTICLE VI: CONSIDERATIONS IN VOTING ON THE PLAN

The Debtor has proposed a Plan that it believes treats all creditors fairly and equitably and is in the best interest of the creditors. In order to assist the creditors in evaluating the Plan, the Debtor provides the following summary of items which Debtor believes to be significant considerations for creditors in deciding how to vote on the Plan. References are made to paragraphs in this Disclosure Statement and Plan of Reorganization which discuss and have summarized topics in greater detail. **THE FOLLOWING IS ONLY A BRIEF SUMMARY AND SHOULD NOT BE RELIED UPON EXCLUSIVELY FOR VOTING PURPOSES. YOU ARE URGED TO READ ALL OF THIS DISCLOSURE STATEMENT, THE PLAN OF REORGANIZATION IN FULL AND**

**ALL OTHER RELEVANT ORDERS AND DOCUMENTS ON FILE IN THESE PROCEEDINGS.**

1.    <u>Possible Tax Consequences</u>. Implementation of the Plan will result in income, gain, or loss for federal income tax purposes to holders of claims against and interests in Debtor. Tax consequences to a particular Creditor or holder of an interest in Debtor may depend on the particular circumstances or facts regarding the Claim of the Creditor or the interest of such holder in Debtor. To the extent that a holder of a Claim receives a distribution under the Plan which is less than the full amount of the Claim, and the remainder of the Claim is being discharged under the Plan, that holder of a Claim may be entitled to a deduction from taxable income to the extent of the realized loss on the Claim (but only to the extent the loss has not been recognized in prior tax years).

Each holder of an interest in Debtor will recognize taxable income or gain as a result of the implementation of the Plan to the extent that the holder's allocable share of the gain from the transfer of the Property and/or income from cancellation of indebtedness due to the modification and/or discharge of Claims under the Plan.

**THE TAX CONSEQUENCES TO EACH CLAIMANT RESULTING FROM ANY REORGANIZATION OF DEBTOR OR LIQUIDATION OF DEBTOR'S ASSETS ARE COMPLEX AND MAY VARY AND WILL DEPEND UPON THE PARTICULAR CIRCUMSTANCES OF EACH CLAIMANT. CONSEQUENTLY, EACH CLAIMANT IS URGED TO CONSULT HIS OWN TAX ADVISOR WITH SPECIFIC REFERENCE TO HIS PARTICULAR CIRCUMSTANCES AND TO THE TAX CONSEQUENCES OF BOTH THE PLAN AND ANY ALTERNATIVE TO THE PLAN AND NO CLAIMANT IS AUTHORIZED TO RELY FOR TAX ADVICE OR INFORMATION ON THIS DISCLOSURE STATEMENT.**

## ARTICLE VII: LIQUIDATION ANALYSIS

1.      Liquidation Analysis

The present value of the Debtor's real estate is less than the amount of the Bank's Claim of $6,450,389.96 because the Debtor would be forced to sell the lots and townhomes in bulk at heavily discounted prices. The proceeds of sales would be insufficient to pay the Bank Claim and unsecured creditors would receive nothing in the event the Debtor's real estate were foreclosed upon by the Bank or sold by a Chapter 7 trustee. If HSM Meyers, Ltd. were liquidated, there would be insufficient funds to pay its secured and unsecured creditors. However, equity can be realized and all creditors paid in full under the Plan.

2.      Debtor's Recommendation:

**BASED ON THE CONTENTS OF THIS DISCLOSURE STATEMENT, THE DEBTOR BELIEVES IT IS IN THE BEST INTERESTS OF ALL CREDITORS THAT THE PLAN AS PROPOSED BY THE DEBTOR BE APPROVED BY ITS CREDITORS. DEBTOR BELIEVES THAT REORGANIZATION WOULD PRODUCE MORE DISTRIBUTION TO CREDITORS THAN IF THE DEBTOR WERE LIQUIDATED. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT ITS CREDITORS VOTE TO CONFIRM THE PLAN AS FILED BY THE DEBTOR.**

(Remainder of the Page Intentionally Left Blank)

Dated: March 1, 2010.

HSM LAKESHORE, LTD.

By: _____
      Don R. Plunk,
      President of the General Partner of the
      Debtor

Submitted by:

HIERSCHE, HAYWARD, DRAKELEY
    & URBACH, P.C.

By: _____
    Gerald P. Urbach (SBN 20412000)
    Russell W. Mills (SBN 00784609)
    Jason M. Katz (SBN 24038990)

15303 Dallas Parkway, Suite 700
Addison, Texas 75001
Telephone: (972) 701-7000
Facsimile: (972) 701-8765

Gerald P. Urbach
Texas SBN 20412000
gurbach@hhdulaw.com
Russell W. Mills
Texas SBN 00784609
rmills@hhdulaw.com
Jason M. Katz
Texas SBN 24038990
jkatz@hhdulaw.com
HIERSCHE, HAYWARD, DRAKELEY & URBACH, P.C.
15303 Dallas Parkway, Suite 700
Addison, TX 75001
Ph: 972-701-7000
Fax: 972-701-8765
ATTORNEYS FOR HSM LAKESHORE, LTD.

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HSM LAKESHORE, LTD.** | § | |
| | § | |
| | § | **Case No. 09-47653-rfn-11** |
| Debtor. | § | |

## DEBTOR'S PLAN OF REORGANIZATION

HSM Lakeshore Ltd., Debtor herein (the "Debtor"), proposes the following Plan of Reorganization (the "Plan") pursuant to 11 U.S.C. § 1121(c):

## ARTICLE 1

## DEFINITIONS

1.1     Defined Terms. In addition to such other terms as are defined in other Sections of this Plan, the following terms shall have the meanings set forth below (such meanings to be applicable equally to both the singular and plural, masculine and feminine forms of the terms defined).

1.2     "Administrative Expense" means any Allowed Claim constituting a cost or expense of administration of the Chapter 11 Case allowed under subsections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estate of the Debtor, any actual and necessary expenses of operating the business of the Debtor, all compensation to professionals or reimbursement of expenses of professionals to the extent allowed by the Bankruptcy Court under section 330 or 503 of the



Bankruptcy Code and any Allowed Claim against the Debtor arising after the Petition Date and prior to the Effective Date.

1.3 "Administrative Expense Creditor" means any Person entitled to payment on account of an Administrative Expense.

1.4 "Allowed," when used with respect to a Claim or Partnership Interest, means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no objection was filed by the Objection Deadline, unless such Claim is the subject of a pending action in a forum other than the Bankruptcy Court, in which case such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court; or (ii) as to which an objection was filed by the Objection Deadline, to the extent allowed by a Final Order. "Allowed," when used with respect to an Administrative Expense of a Professional shall mean an Administrative Expense approved by application to the Bankruptcy Court and entry of an Order approving such Administrative Expense.

1.5 "Assets" means all of the right, title, and interest in and to property of whatsoever type or nature owned by the Debtor as of the Petition Date, together with assets subsequently acquired by the Debtor, and including, but not limited to, property defined in section 541 of the Bankruptcy Code (each identified item of property being herein sometimes referred to as an Asset), the available insurance or insurance policies, or any cause of action pursued, pursuable, or owned by Debtor including all Avoidance Actions and Litigation Claims.

1.6 "Avoidance Action" means a cause of action assertable by the Debtor against all Entities and brought under sections 541, 542, 543, 544, 545, 547, 548, 549, 550, 552, or 553 of the Bankruptcy Code.

1.7 "Ballot" means the form of ballot provided to holders of Claims or Partnership Interests pursuant to Bankruptcy Rule 3017(d), by which each holder may accept or reject the Plan and select any optional treatment for an Allowed Claim or Allowed Partnership Interest.

1.8 "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified at title 11 of the United States Code, as applicable to this Chapter 11 Case.

1.9 "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, or such other court having jurisdiction over all or any part of the Chapter 11 Case.

1.10 "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to this Chapter 11 Case, including applicable Local Rules of the Bankruptcy Court.

1.11   "Business Day" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in New York, New York are authorized or obligated by law or executive order to close.

1.12   "Cash" means legal tender of the United States of America.

1.13   "Chapter 11 Case" means the above captioned and numbered reorganization proceeding of the Debtor under Chapter 11 of the Bankruptcy Code.

1.14   "Claim" means:  (a) a right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

1.15   "Claimant" means the holder of a Claim.

1.16   "Claims Bar Date" means the date on which all Creditors, other than Creditors with Administrative Expense Claims as described in Article 4.1 of the Plan, must have filed a Proof of Claim with the Bankruptcy Court, as follows: for Creditors other than governmental units, March 4, 2010; for Creditors who are governmental units, May 3, 2010.

1.17   "Class" means a category or group of holders of Claims or Current Partnership Interests as designated in Article 2.0 of the Plan.

1.18   "Collateral" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim.

1.19   "Compass Bank" means BBVA Compass Bank and its agents, affiliates and representatives and any predecessors or successors-in-interest.

1.20   "Compass Bank Collateral" means Collateral that secures payment of the Compass Bank Secured Claim.

1.21   "Compass Bank Deeds of Trust" means the Deed of Trust lien on the real property owned by Debtor and the real property owned by HSM Myers, Ltd. in connection with the debt owed to Compass Bank by Debtor and by HSM Myers, Ltd.

1.22   "Compass Bank Notes" means the Promissory Notes executed respectively by Debtor and HSM Myers, Ltd., payable to Compass Bank.

1.23   "Confirmation Date" means the date of entry of the Confirmation Order.

1.24 "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as the same may be continued from time to time.

1.25 "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.26 "Contested," when used with respect to a Claim, means a Claim against the Debtor (a) that is listed in the Debtor's Schedules as disputed, contingent, or unliquidated; (b) that is listed in the Debtor's Schedules as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; or (c) as to which an objection has been or may be timely filed and has not been denied by Final Order. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Contested Claim only to the extent of the objection.

1.27 "Creditor" means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

1.28 "Current Partnership Interests" means the limited partnership interests in the Debtor owned by HSMCO, Inc. and HSM Lakeshore GP, LLC.

1.29 "Debtor" means HSM Lakeshore, Ltd., a Texas limited partnership, Federal ID No. 26-4795991.

1.30 "Executory Contracts" means the Debtor's executory contracts that are identified in Schedule G of the Schedules.

1.31 "Deemed Collateral Value" means, unless otherwise determined as provided for herein, a value equal to the amount, as of the Petition Date, of the Allowed Claim it secures that shall be the value of the Collateral solely for purposes of this bankruptcy case.

1.32 "Disallowed," when used with respect to all or any part of a Claim or Current Partnership Interest, means that portion of a Claim or Current Partnership Interest to which an Objection or Motion to Disallow has been sustained by a Final Order.

1.33 "Disclosure Statement" means the written statement, as amended, supplemented, or modified from time to time, describing the Plan that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.34 "Effective Date" means the first Business Day after the Confirmation Date on which all conditions to the effectiveness of the Plan, as specified in Paragraph 12.1, have been satisfied or waived.

1.35   "Entity" means any corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity, and any Person.

1.36   Exhibits. All exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

1.37   "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which order or judgment the time to appeal or seek rehearing or petition for *certiorari* shall have expired or which order or judgment no longer shall be subject to appeal, rehearing, or *certiorari* proceeding and with respect to which no appeal, motion for rehearing, or *certiorari* proceeding or stay then shall be pending.

1.38   "Guarantors" means HSMCO, Inc. and HSM Devco Ltd.

1.39   "Guaranty Agreements" means the Guaranty Agreement (Payment and Performance) dated February 14, 2006 executed by HSM Devco and HSMCO in connection with the Initial Land Loan and the Development Loan executed by HSM Devco and HSMCO in connection with the Development Loan.

1.40   "Guaranty Litigation" means the lawsuit initiated by Compass Bank against the Guarantors.

1.41   "Guaranty Obligations" means the alleged obligations to Compass Bank arising from the Guaranty Agreements.

1.42   "HSMCO" means HSMCO, Inc., a Delaware corporation, a 99% limited partner in Debtor.

1.43   "HSM Devco" means HSM Devco, Ltd., a Texas limited partnership, one of the Guarantors of the debt to Compass Bank.

1.44   "Interpretation. Unless otherwise specified, all section, article and exhibit references in this Plan are to the respective section in, article of, or exhibit to, the Plan as the same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience and reference only and shall not limit or otherwise affect the provisions hereof.

1.45   "HSM Myers Ltd." means a related entity which owns 35 residential lots which are cross collateralized as security for Debtor's oblations to Compass Bank.

1.46   "IRS" means the Internal Revenue Service.

1.47 "Compass Bank Secured Claim" means that portion of the Allowed Claim held by Compass Bank that is secured by a Lien on an Asset and a lien on assets of HSM Myers, Ltd., which Lien is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law, which is duly Allowed.

1.48 "Lien" means any mortgage, lien, charge, security interest, encumbrance, or other security device of any kind affecting any asset or property of the Debtor or HSM Myers Ltd. contemplated by section 101(37) of the Bankruptcy Code.

1.49 "Litigation Claims" means all claims and causes of action of any kind owned by Debtor on the Effective Date other than Avoidance Actions regardless of whether any suits or other proceedings have been instituted on such claims and causes of action and regardless of whether same have been identified herein or in the Schedules, Statement of Affairs or Disclosure Statement.

1.50 "Lakeshore Lots" means 107 townhouse lots that are located in the City of Grand Prairie, Texas and which serve as collateral for the Compass Notes.

1.51 "Lakeshore Townhouses" means 18 townhouses owned by Debtor which serve as collateral for the Compass Notes, some of which are being leased.

1.52 "Net Profit" means profits (not including any lawsuit proceeds) after deduction of all expenses including taxes.

1.53 "New Partnership Interest" means the partnership interests in the Reorganized Debtor that shall be issued to the New Partnership Interest Owner.

1.54 "New Partnership Interest Owner" means the buyer who purchases the New Partnership Interests in accordance with Section 7.7.

1.55 "Objection" means an objection to the allowance of a Claim or Current Partnership Interest interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.

1.56 "Objection Deadline" means the date by which Objections to Claims must be filed, to be fixed in the manner prescribed under Section 9.1 of the Plan.

1.57 Other Terms. The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code.

1.58   "Unsecured Claims" means all Allowed Claims of HSM Myers Ltd. and Debtor to which no lien attaches.

1.59   "Myers Meadow Partial Release Price" means the price for any Myers Meadow Lot that Debtor must pay to Compass to obtain a release of that Lot from the Compass Bank Deeds Of Trust, which will be 85% of the net proceeds of the aggregate sales price of HSM Myers lots (sales price of $52,500).

1.60   "Lakeshore Partial Release Price" means the price for any Lakeshore lot or townhouse that Debtor must pay to Compass to obtain a release of the Lot or Townhouse from the Compass Bank Deeds of Trust, which will be 85% of the net proceeds of the aggregate sales price of HSM Lakeshore townhomes (sales price of $200,000), HSM Lakeshore lots (sales price of $20,000).

1.61   "Total New Partnership Interest Owner Contributions" means the total amount of all contribution(s) provided to Debtor by the New Partnership Interest Owners.

1.62   "Monthly New Partnership Interest Owner Contributions" means the amount of contributions provided to Debtor by the New Partnership Interest Owners on a monthly basis, as that number may vary from month.  The total of all Monthly New Partnership Interest Owner Contributions shall equal to the Total New Partnership Interest Owner Contributions.

1.63   "Person" means any individual.

1.64   "Petition Date" means November 30, 2009.

1.65   "Plan" means this Chapter 11 Plan of Reorganization, either in its present form or as it may be altered, amended, or modified from time to time.

1.66   "Plan Documents" means the exhibits to the Plan, if any.

1.67   "Priority Claim" means an Allowed Claim other than a Claim for an Administrative Expense to the extent that it is entitled to priority in payment under section 507(a) of the Bankruptcy Code including, without limitation, Priority Employee Claims, Priority Tax Claims, and Priority IRS claims.

1.68   "Priority Tax Claim" means an Allowed Claim of a governmental unit of the kind specified in subsection 507(a)(8) of the Bankruptcy Code but not including Priority IRS Tax Claims and Comptroller Claims.

1.69   "Schedules" means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules or statements have been or may be amended subsequently.

1.70 "Secured Claim" shall mean: (a) an Allowed Claim secured by a Lien on an Asset, which Lien is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law, and that is duly Allowed, but only to the extent that such Claim does not exceed the value of Assets that the Bankruptcy Court finds are valid security for such Claim; and (b) an Unmatured Secured Tax Claim.

1.71 "Secured Dallas County Tax Claim" means the claim held by Dallas County, Texas for pre-petition *ad valorem* property taxes related to the Lakeshore Property.

1.72 "Secured Mansfield ISD Tax Claim" means the claim held by Mansfield ISD for pre-petition ad valorem taxes related to the Lakeshore property.

1.73 "Secured Tarrant County Tax Claim" means the claim held by Tarrant County for prior petition ad valorem taxes related to the Lakeshore Property.

1.74 "Myers Meadow Second Tax Creditors" means any pre-petition claim for ad valorem taxes related to the HSM Myers Property.

1.75 "Unclaimed Property" means any Cash, distribution, or any other property of the Debtor unclaimed for a period of sixty (60) days after the Effective Date as set forth in Section 8.4 of the Plan.

1.76 "Unmatured Secured Tax Claim" means any Claim for pre-petition *ad valorem* and business personal property taxes that has not yet matured and excluding the Secured Collin County Tax Claim, Mansfield ISD Tax Claim and Tarrant County Tax Claim.

# ARTICLE 2

## CLASSIFICATION OF CLAIMS AND CURRENT PARTNERSHIP INTERESTS

2.1 The following is a designation of the Classes of Claims and Current Partnership Interests under this Plan. Administrative Expense Claims and Priority Tax Claims have not been classified and are excluded from the following classes in accordance with section 1123(a)(1) of the Bankruptcy Code. A Claim or Current Partnership Interest shall be deemed classified in a particular Class only to the extent that the Claim or Current Partnership Interest qualifies within the description of that Class. A Claim or Current Partnership Interest is in a particular Class only to the extent that the Claim or Current Partnership Interest is an Allowed Claim or Current Partnership Interest in that Class.

2.2 Claims and Current Partnership Interests:

Class 1 – Compass Bank Secured Claims

Class 2 – Secured Collin County Tax Claim

Class 3 – Secured Mansfield ISD Tax Claim

Class 4 – Secured Tarrant County Tax Claim

Class 5 – Secured HSM Myers Ltd. Tax Claims

Class 6 – Unsecured Claims of Debtor and HSM Myers, Ltd.

Class 7 – Current Partnership Interests in Debtor and HSM Myers, Ltd.

## ARTICLE 3

### IDENTIFICATION OF IMPAIRED CLASSES OF
### CLAIMS AND CURRENT PARTNERSHIP INTERESTS

3.1     Impaired Classes of Claims and Partnership Interests.  All Classes of Claims and Current Partnership Interests are impaired under the Plan.

3.2     Impairment Controversies.   If a controversy asserted in an objection to confirmation or other written pleading arises as to whether any Class of Claims or Current Partnership Interest is impaired under the Plan, the Bankruptcy Court shall determine such controversy after notice and a hearing and, if no such pleading is filed, then the identity of any impaired class will be conclusively determined by Section 3.1 of the Plan.

## ARTICLE 4

### TREATMENT OF ADMINISTRATIVE
### EXPENSES AND PRIORITY TAX CLAIMS

4.1     Administrative Expenses.  All Administrative Expenses against the Debtor shall be treated as follows:

(1)     Administrative Expenses Bar Date.  The holder of any Administrative Expense other than:  (i) a claim for professional fees and expenses for services rendered up to and including the Confirmation Date, (ii) a liability incurred and paid in the ordinary course of business by the Debtor; or (iii) an Allowed Administrative Expense, must file with the Bankruptcy Court and serve on the Debtor and its counsel, notice of such Administrative Expense within fifteen (15) days after the Confirmation Date.  Such notice must identify:  (i) the name of the holder of such Claim; (ii) the amount of such Claim; (iii) the basis of such Claim; and (iv) all written documentation supporting such Claim.  Failure to file this notice timely and

properly shall result in such claim for the Administrative Expense being forever barred and discharged.

(2)     Allowance of Administrative Expenses.  An Administrative Expense with respect to which notice has been properly filed pursuant to Section 4.1(a) of the Plan shall become an Allowed Administrative Expense if no objection is filed within thirty (30) days after the filing and service of notice of such Administrative Expense.  If an objection is timely filed, the Administrative Expense shall become an Allowed Administrative Expense only to the extent Allowed by Final Order.

(3)     Payment of Allowed Administrative Expenses.  Each holder of an Allowed Claim for an Administrative Expense other than a professional holding such a claim shall receive, at the Debtor's option:  (i) the amount of such holder's Allowed Claim in one Cash payment on the later of the Effective Date or the tenth Business Day after such Claim becomes an Allowed Claim; (ii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost; or (iii) such other treatment as may be agreed to in writing by the holder of such Administrative Expense and the Debtor.

(4)     Payment of Allowed Administrative Expenses To Professionals.  Each holder of an Allowed Administrative Claim that is a professional shall be paid in full by Debtor HSM Devco, Ltd. and/or HSMCO on the date upon which an order approving such claim becomes final and nonappealable.  Debtor, HSM Devco, Ltd. and/or HSMCO, jointly and severally, are responsible for and shall make payment of such fees and expenses in full within ten(10) days of a final order approving such fees and expenses.  Professional fees and expenses incurred after the Confirmation Date shall be the obligation of the Reorganized Debtor, HSM Devco, Ltd. and HSMCO and shall be payable by the Reorganized Debtor HSM Devco, Ltd. and HSMCO promptly and without the need for application to or approval by the Bankruptcy Court. HSMCO's guarantee of payment of professional fees and expenses is reaffirmed by HSM Devco, Ltd. and HSMCO and shall continue until all of such fees and expenses are paid in full.

4.2     <u>Unmatured Secured Tax Claims</u>.  Each holder of an Unmatured Secured Tax Claim shall be paid by the Debtor at the time the Unmatured Secured Tax Claim becomes due and payable and in accordance with the Debtor's ordinary practice.

## ARTICLE 5

## TREATMENT OF CLAIMS AND CURRENT PARTNERSHIP INTERESTS

5.1     <u>Class 1 – Compass Secured Claim</u>.  The Compass Bank Secured Claim shall not exceed the amount of outstanding principal, interest and costs and fees allowable under 11 U.S.C. §506(b).  Compass Bank shall receive on account of the Compass Bank Secured Claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the Effective Date, of at least the value of Compass Bank's interest in the Compass Bank Collateral. On the Effective Date, the Compass Notes will be amended, renewed, extended, restructured and

modified on the terms herein and so as not to impair the priority of the Lien held by Compass Bank. Debtor will pay the Amended Compass Bank Notes in monthly principal and interest payments beginning the first day of the month following the Effective Date and continuing for fifty-six (56) additional months until paid in full. All interest-bearing obligations in this Section shall bear simple interest at a rate of 3% per annum. The Partial Release Price for the Lakeshore Lots, the Lakeshore Townhomes and the Myers Meadow Lots is reduced to 85% of the net proceeds of sale. Upon confirmation, any and all defaults that have occurred under the Loan Documents shall be deemed cured.

5.2     Class 2 – Secured Collin County Tax Claims. Collin County shall retain any lien it currently holds and will receive payment in full of its Allowed Collin County Tax Claim on the later of the Effective Date.

5.3     Class 3 – Secured Mansfield ISD Tax Claim. Mansfield County shall retain any lien it currently holds and will receive payment in full of its Allowed Collin County Tax Claim on the later of the Effective Date.

5.4     Class 4 – Secured Tarrant County Tax Claims. Tarrant County shall retain any lien it currently holds and will receive payment in full of its Allowed Collin County Tax Claim on the later of the Effective Date.

5.5.    Class 5 – Secured Myers Meadow Tax Claims. Myers Meadow shall retain any lien it currently holds and will receive payment in full of its Allowed Myers Meadow Tax Claim on the later of the Effective Date.

5.6     Class 6 – Unsecured Claims. Each holder of an Allowed Unsecured Claim is either Debtor HSM Myers, Ltd. will receive on account of its Allowed Unsecured Claim the full amount of their Allowed Unsecured Claim as shown in the projections attached to the Disclosure Statement.

5.7     Class 7 – Current Partnership Interests. All Current Partnership Interests in the Debtor and HSM Myers, Ltd. shall be canceled on the Effective Date and New Partnership Interests shall be issued to the New Partnership Owners making Partnership Contributions as provided in Paragraph 7.5 of the Plan.

# ARTICLE 6

## ACCEPTANCE OR REJECTION OF PLAN

6.1     Classes Entitled to Vote. Each impaired Class of Claims and Current Partnership Interests shall be entitled to vote separately to accept or to reject the Plan. Any unimpaired Class of Claims or Current Partnership Interests shall not be entitled to vote to accept or to reject the Plan. Classes 1, 2, 3, 4 and 5 are impaired and holders of such Allowed Claims therefore are entitled to vote on the Plan.

6.2    Class Acceptance Requirement. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan. A Class of Partnership Interests shall have accepted the Plan if it is accepted by at least two-thirds (2/3) of the number of the Allowed Current Partnership Interests in such Class that actually have voted on the Plan.

6.3    Cramdown. This Section shall constitute the Debtor's request, pursuant to section 1129(b)(1), that the Bankruptcy Court confirm the Plan notwithstanding the fact that the requirements of section 1129(a)(8) may not be met.

6.4    Cure Payments and Release of Liability. All cure payments that may be required by Bankruptcy Code Section 365(b)(1) under any executory contract or unexpired lease that is assumed, or assumed and assigned, under this Plan shall be made by the Debtor on or as soon as practicable after the Effective Date; provided, however, in the event of a dispute regarding the amount of any cure payments, the cure of any other defaults, the ability of the Debtor to provide adequate assurance of future performance, or any other matter pertaining to assumption or assignment, the Debtor shall make such cure payments and cure such other defaults and provide adequate assurance of future performance, all as may be required by Bankruptcy Code Section 365(b)(1), following the entry of a Final Order resolving such dispute. To the extent that a party to an assumed executory contract or unexpired lease has not filed an appropriate pleading with the Bankruptcy Court on or before the thirtieth (30th) day after the Effective Date disputing the amount of any cure payments offered to it by the Debtor, disputing the cure of any other defaults, disputing the promptness of the cure payments, or disputing the provisions of adequate assurance of future performance, then such party shall be deemed to have waived its right to dispute such matters.

# ARTICLE 7

## MEANS OF IMPLEMENTATION OF THE PLAN

7.1    The Debtor's Assets and Liabilities will be substantially consolidated with the assets and liabilities of HSM Myers, Ltd. Together, the assets of the combined entities will be sold over a period of fifty-seven (57) months and the proceeds of sale according to Debtor's projections will pay all Allowed Claims in the case, including the claim of Compass Bank.

7.2    On the Effective Date, the Reorganized Debtor shall assume all liabilities pursuant to this Plan.

7.3    On the Effective Date, all right, title, and interest in and to the Assets shall vest in the Reorganized Debtor.

7.4    The Reorganized Debtor shall have the powers and duties specified in this Plan together with all other powers of a Texas limited partnership. Such powers shall include,

without limitation, the power to object to Claims, to administer Cash and Cash on Hand and to operate the business of the Reorganized Debtor subject only to any limitations imposed by the Plan. The Reorganized Debtor may operate without approval from the Bankruptcy Court.

7.5     The Reorganized Debtor shall own all Avoidance Actions and all Litigation Claims and shall have full power to institute, proceed to trial and appeal, settle or dismiss any Avoidance Action or Litigation Claim without approval from the Bankruptcy Court.

7.6     The New Partnership Interest Owner will purchase all of the New Partnership Interests in the Reorganized Debtor. The Total New Partnership Interest Owner Contribution is the amount shown on the Exhibit "B" to the Disclosure Statement. The Total New Partnership Interest Owner Contribution shall be used by the Debtor, to the extent deemed by the Debtor as necessary, to fund its continuing operations and Plan obligations. The Debtor will determine, on a monthly basis, the amount of the Monthly New Partnership Interest Owner Contribution necessary for operations during that month and, on or before the 20th of each calendar month, will request such amount from the New Partnership Interest Owner. The New Partnership Interest Owner shall pay the Monthly Partnership Interest Owner Contribution to the Debtor on or before the 5th of each calendar month. Except upon the express written consent of the New Partnership Interest Owner, the Monthly New Partnership Interest Owner Contribution shall not exceed the previous month's Monthly New Partnership Interest Owner Contribution by ten percent (10%).

7.7     The New Partnership Interest Owner shall act as the general partner of the Debtor and shall have all of the duties, responsibilities, and powers of a general partner under Texas law.

7.8     Confirmation of the Plan shall be deemed to constitute a permanent injunction against maintenance or commencement of any action against Debtor arising out of any events occurring prior to the filing of this case and all holders of Claims against Debtor are permanently enjoined with respect to such Claims: (a) from commencing or continuing any action or proceeding of any kind with respect to any such Claim against the Reorganized Debtor and/or the Assets; (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Assets and/or the Reorganized Debtor; (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Assets and/or the Reorganized Debtor; (d) from asserting any right of subrogation or recoupment of any kind against any obligation due the Debtor or the Reorganized Debtor; and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and all Claims and causes of action held by all Entities against the Debtor and the Reorganized Debtor are released and discharged except the obligations of the Reorganized Debtor pursuant to the provisions of the Plan; provided, however, that each holder of a Contested Claim may continue to prosecute its proof of Claim in the Bankruptcy Court and all holders of Claims and Partnership Interests shall be entitled to enforce their rights under the Plan and any agreements executed or delivered pursuant to or in connection with the Plan.

7.9     The Reorganized Debtor shall: (i) be solely responsible for pursuing and/or settling all causes of action owned by the Reorganized Debtor and for distribution of all cash distributions contemplated by the Plan; (ii) have the right and power to enter into any contract or agreements binding the Reorganized Debtor in connection with the performance of its duties; (iii) have power to issue or arrange for the issuance of its Partnership Interests to New Partnership Owners; (iv) have power to borrow funds and/or obtain investors and/or sell or encumber its real estate for valid business purposes including funding any cash obligations pursuant to the Plan, funding expansion of Debtor's business as contemplated by Debtor's business plans submitted in support of confirmation of the Plan; (v) have power to do all acts contemplated by the Plan; and (vi) have sole discretion to settle or compromise any claim, cause of action, chose-in-action or litigation and settle any such claim, cause of action, chose-in-action or litigation, without approval of the Bankruptcy Court.

7.10    Subject to the following, the Debtor reserves the right to revoke and withdraw this Plan before the entry of the Confirmation Order. If the Debtor revokes or withdraws this Plan, or if confirmation of this Plan does not occur, then this Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or to prejudice in any manner the rights of the Debtor, or person in any further proceedings involving the Debtor or to provide the basis for any claim against Debtor.

7.11    The holder and beneficiary of the Guaranty Obligations is hereby enjoined from: (a) commencing or continuing in any manner any action, proceeding or lawsuit against the Guarantors based on the Guaranty Agreements, or (b) enforcing, attaching, collecting or recovery on account of any judgment, award, decree or other against the Guarantors or their respective assets or property on account of the Guaranty Obligations; provided, however, that: (a) such injunction shall automatically terminate if the Reorganized Debtor defaults in the payment of the Amended Compass Bank Notes in accordance with this Plan; and (b) the Reorganized Debtor shall not be deemed in default under this Plan in respect of the Guaranty Obligations until the Reorganized Debtor has been given 30 days written notice of default and an opportunity to cure such default during such 30 day period. In addition, the holder of the Guaranty Obligations will be required to exhaust all of its remedies against the Compass Bank Collateral including but not limited to foreclosing and selling the Compass Bank Collateral in a commercially reasonable manner before pursuing the Guarantors.

## ARTICLE 8

## PROVISIONS GOVERNING DISTRIBUTION

8.1     All payments or distributions to be made by the Debtor pursuant to the Plan shall be made to the holders of Allowed Claims. Any payments or distributions to be made by the Debtor pursuant to the Plan shall be made on the Effective Date except as otherwise provided for in the Plan, or as may be ordered by the Bankruptcy Court. Any payment or distribution by the Debtor pursuant to this Plan, to the extent delivered by the United States Mail, shall be deemed made when deposited by the Debtor into the United States Mail.

8.2     Distributions to be made to any holder of an Allowed Claim under the Plan shall be made by the Reorganized Debtor.

8.3     Payments of Cash to be made by the Reorganized Debtor pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

8.4     Distributions and deliveries to holders of Allowed Claims shall be made at the addresses set forth on the proofs of Claim or proofs of interest filed by such holders (or at the last known addresses of such holders if no proof of Claim or proof of interest is filed; or if the Reorganized Debtor has been notified of a change of address, at the address set forth in such notice). All Unclaimed Property shall revert to the estate for distribution of an additional *pro rata* Share to holders of Other Unsecured Claims, and the Claim of any holder with respect to such property shall be discharged and forever barred.

8.5     Checks issued by the Reorganized Debtor in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of delivery thereof. Requests for re-issuance of any check shall be made directly to the Reorganized Debtor by the holder of the Allowed Claim to whom such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of the first anniversary of the Effective Date or ninety (90) days after the date of delivery of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred.

8.6     Except as provided otherwise herein, no interest shall be paid on any Claim after the Petition Date. Except as provided otherwise herein, interest will be paid through the Petition Date only in accordance with the applicable loan documents.

8.7     The Debtor expressly reserves the right, in its sole discretion, to prepay in Cash any obligation created pursuant to the Plan, and no interest shall accrue with respect to such obligation from and after the date of such prepayment. The Debtor also expressly reserves the right to negotiate post-confirmation with the holder of any Allowed Claim who may desire to change the treatment elected with respect to such Allowed Claim and to agree to any change of treatment of such Allowed Claim, provided such treatment does not result in a violation of the absolute priority rule or otherwise materially affect any treatment of any class of creditors under this Plan.

8.8     Any monies utilized to pay obligations hereunder shall become general funds of the Reorganized Debtor.

# ARTICLE 9

## PROCEDURES FOR RESOLVING AND TREATING
## CONTESTED AND CONTINGENT CLAIMS

9.1     Unless a different date is set by order of the Bankruptcy Court, all objections to Claims shall be served and filed no later than one hundred eighty (180) days after the Confirmation Date or one hundred twenty (120) days after a particular proof of claim is filed, whichever is later.   All proofs of claim filed after more than thirty (30) days after the Confirmation Date shall be of no force and effect, shall be deemed disallowed, and will not require objection.

9.2     (a)     Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any Contested Claim unless and until such Contested Claim becomes an Allowed Claim.

        (b)     In determining the amount of distributions to be made under the Plan to holders of Allowed Claims, the appropriate distributions required by the Plan shall be made according to estimates and subject to the provisions of the Plan.

        (c)     As soon as practicable after a Contested Claim becomes fixed, the holder of an Allowed Claim shall receive a distribution in an amount equal to the aggregate of all the distributions that such holder would have received had such Contested Claim been an Allowed Claim on the Effective Date.   No interest shall be paid on account of a Contested Claim that later becomes an Allowed Claim.

9.3     Distributions to each holder of a Contested Claim, to the extent that such Claim becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such Claim belongs, and such holders shall receive all distributions to which such holders would have been entitled had such Claim been an Allowed Claim on the Effective Date.

# ARTICLE 10

## EXECUTORY CONTRACTS AND LEASES

10.1    Confirmation of the Plan shall constitute an Order finding that the Debtor has not defaulted under any of the Executory Contracts, that Debtor has provided cure and adequate assurance of future performance under the Executory Contracts, and that all of the Executory Contracts including the leases and service contract outlined on Schedule G of the Debtor's Schedules and all executory contracts of HSM Myers Ltd. are assumed by the Reorganized Debtor.

# ARTICLE 11

## MAINTENANCE OF CAUSES OF ACTION

11.1    The Reorganized Debtor shall retain all causes of action belonging to the estate pursuant to section 541 of the Bankruptcy Code, including but not limited to the Avoidance Actions and the Litigation Claims.  All Avoidance Actions and Litigation Claims shall remain the property of the Reorganized Debtor.  If not dismissed prior to the entry of the Confirmation Order, the Bank Litigation will be deemed dismissed with prejudice.

# ARTICLE 12

## CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN

12.1    The Effective Date of the Plan shall not occur unless and until the following conditions shall have been satisfied or waived by the Debtor, as determined in their sole discretion:    (a) the Confirmation Order shall have been entered; and (b) no stay of the Confirmation Order shall be in effect on the Effective Date.

# ARTICLE 13

## DISCHARGE

13.1    To the extent permitted by section 1141 of the Bankruptcy Code, all consideration and Assets distributed under the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor or any of its assets or properties; and except as otherwise provided herein, upon the Effective Date, the Debtor and its successors-in-interest shall be deemed discharged and released pursuant to section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims treated in the Plan, as well as all other Claims, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not:  (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code; (c) the holder of a Claim based upon such debt has accepted this Plan; or (d) the Claim has been Allowed, disallowed, or estimated pursuant to section 502(c) of the Bankruptcy Code.  The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor and its successors-in-interest other than those obligations specifically set forth pursuant to this Plan.

# ARTICLE 14

## SUBSTANTIAL CONSUMMATION

14.1 This Plan of Reorganization shall be consummated substantially upon the commencement of the first distributions of Cash to the holders of Allowed Claims under this Plan or upon the Debtor's receipt of the Partnership Contributions.

# ARTICLE 15

## RETENTION OF JURISDICTION

15.1 Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, for the purposes of sections 105(a) and 1142 of the Bankruptcy Code, and, subject to the provisions of the following subparagraph (b), for, among other things, the following purposes:

(a) To hear and to determine any and all objections to or applications concerning the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense (except fees and expenses of professionals as described in subparagraph [b] below), Claim, or Current Partnership Interest;

(b) To hear and determine any and all applications for payment of fees and expenses to be paid from the Debtor's estate to attorneys or other Professionals pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed to Professionals from the Debtor's estate under the Bankruptcy Code, and any and all objections thereto, provided, however, that no jurisdiction is retained to hear or allow fees and expenses of Professionals arising after the Effective Date, including, without limitations, any Professionals who are retained to pursue Avoidance Actions or Litigation Claims;

(c) To hear and determine pending applications for the rejection, assumption, or assumption and assignment of unexpired leases and executory contracts and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect of the assumption or rejection of any executory contract or lease or any claimed termination thereof, including any rights affected by confirmation of this Plan;

(d) To hear and determine any and all adversary proceedings, applications, or contested matters, including any remands from any appeals with respect to causes of action arising before or during the pendency of the Chapter 11 Case;

(e) To hear and to determine all controversies, disputes, and suits that may arise in connection with the execution, interpretation, implementation, consummation, or

enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan provided that jurisdiction shall not be retained for the purpose of supervision or review of the Debtor's economic performance, business operations or financial status and transactions after the Effective Date;

      (f)    To liquidate any disputed, contingent, or unliquidated claims;

      (g)    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

      (h)    To enter and to implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

      (i)    To enable the Reorganized Debtor to prosecute any and all proceedings that may be brought to set aside liens or encumbrances and to recover any transfers, assets, properties or damages to which the Debtor may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws, including causes of action, controversies, disputes and conflicts between the Debtor or Reorganized Debtor and any other party, including but not limited to, any causes of action or objections to Claims, Avoidance Actions or equitable subordination.

      (j)    To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

      (k)    To enter and to implement such orders as may be necessary or appropriate to execute, interpret, implement, consummate, or to enforce the terms and conditions of the Plan and the transactions contemplated thereunder;

      (l)    To hear and to determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

      (m)    To enter a final decree closing the Chapter 11 Case.

    15.2    If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to this Chapter 11 Case, this Section of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

# ARTICLE 16

## MODIFICATIONS TO THE PLAN

16.1    Modifications of this Plan may be proposed in writing by the Debtor at any time before confirmation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be modified at any time after confirmation and before the Effective Date, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

16.2    The Debtor, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Current Partnership Interests, may correct any nonmaterial defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable.  The Debtor may undertake such nonmaterial modification pursuant to this Section insofar as it does not adversely change the treatment of the Claim of any Creditor or the interest of any Current Partnership Interest holder who has not accepted in writing the modification.

# ARTICLE 17

## MISCELLANEOUS PROVISIONS

17.1    <u>Severability</u>.  Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Current Partnership Interest or transaction, the Debtor may modify the Plan in accordance with Section 16.1 or 16.2 of the Plan, as applicable, so that such provision shall not be applicable to the holder of any Claim or Current Partnership Interest.

17.2    <u>Setoffs</u>.  The Debtor may, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever the Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such claim that the Debtor may have against such holder.

17.3    <u>Compliance with All Applicable Laws</u>.  If notified by any governmental authority that they are in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its businesses, the Debtor shall comply with such law, rule, regulation, or order; provided that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings and, if appropriate, an adequate reserve has been set aside on the books of the Debtor.

17.4 <u>Binding Effect</u>. The Plan shall be binding upon, and shall inure to the benefit of, the Debtor, the Reorganized Debtor, the holders of the Claims, the holders of Current Partnership Interests, the holder of New Partnership Interests, and all Entities receiving notice of the Plan and their respective successors and assigns.

17.5 <u>Governing Law</u>. Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

17.6 <u>Payment of Statutory Fees</u>. The Reorganized Debtor shall be responsible for the timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) until the clerk of the court closes the case. The Reorganized Debtor shall file with the Bankruptcy Court, and serve on the United States Trustee, a quarterly financial report for each quarter (or portion thereof) that the case remains open in a format prescribed by the United States Trustee and provided to the Reorganized Debtor by the United States Trustee.

17.7 <u>Post-Confirmation Professional Fees</u>. Post-Confirmation fees and expenses of professionals shall not be subject to approval by the Court.

17.8 <u>Timing of Distributions</u>. Any payment or distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

17.9 <u>Filing of Additional Documents</u>. The Debtor may file, as Plan Documents, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Nothing herein requires or supposes that implementation of the Plan requires any Plan Documents to be executed or filed.

17.10 <u>Certifications</u>. The failure to make any certification required to be made pursuant to the Plan on a timely basis shall result in the Debtor withholding, without interest, any distribution to which the Person required to make such certification would otherwise be entitled. Such withheld distribution shall be made only upon such Person's compliance with the certification requirements of the Plan.

17.11 <u>Payment of Fees</u>. The Reorganized Debtor or, as appropriate, the successful Plan proponent shall be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. § 1030(a)(6). After confirmation, the Reorganized Debtor or, as appropriate, the successful Plan proponent shall file with the Court and serve on the United States Trustee a monthly financial report for each month (or portion thereof) the case remains open. Such report shall be in the form prescribed by the United States Trustee. Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Current Partnership Interest or transaction, the Debtor may modify the Plan in accordance with Section

16.1 or 16.2 of the Plan, as applicable, so that such provision shall not be applicable to the holder of any Claim or Current Partnership Interest.

(Remainder of the Page Intentionally Left Blank)

Dated: March 1, 2010.

HSM LAKESHORE, LTD.

By: _____
    Don R. Plunk,
    President of the General Partner of the
    Debtor

Submitted by:

HIERSCHE, HAYWARD,
    DRAKELEY & URBACH, P.C.

By: _____
    Gerald P. Urbach (SBN 20412000)
    Russell W. Mills (SBN 00784609)
    Jason M. Katz (SBN 24038990)

15303 Dallas Parkway
Suite 700
Addison, Texas  75001
Telephone:  (972) 701-7000
Facsimile:   (972) 701-8765

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| Period | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Month | 4 | 5 | 6 | 7 |
| Period Ending | Apr-10 | May-10 | Jun-10 | Jul-10 |

**INPUTS**

**Lakeshore Townhouse Units**

| | | | |
|---|---|---|---|
| Number of units | | 18 | |
| Initial avg sale price | $ | 200,000 | |
| Sales commissions | | 5% | |
| Closing costs | | 1.5% | |
| Project Overhead | | $400 | per unit per mo |
| HOA dues | | 85 | per unit per mo |
| Taxes | $ | 479 | per unit per mo |

**Lakeshore Townhouse Lots**

| | | | |
|---|---|---|---|
| Number of lots | | 107 | |
| Initial avg sale price | $ | 20,000 | |
| Sales commissions | | 2% | |
| Closing costs | | 0.5% | |
| Project Overhead | $ | 5 | per lot per mo |
| Taxes | $ | 48 | per lot per mo |

**Myers SF Lots**

| | | | |
|---|---|---|---|
| Number of lots | | 35 | |
| Avg sale price | $ | 52,500 | |
| Sales commissions | | - | |
| Closing costs | | 0.50% | |
| Project Overhead | $ | 2 | per lot per mo |
| HOA dues | | 33 | per unit per mo |
| Taxes | $ | 48 | per lot per mo |
| Lakeshore loan principal balance | $ | 6,327,643 | |
| Lakeshore loan interest balance | $ | 167,029 | |
| Myers Loan principal balance | $ | 371,787 | |
| Bank loan interest rate | | 3% | |
| Release price % | | 85% | |

**EXHIBIT**

B

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Month | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| **Period Ending** | **Apr-10** | **May-10** | **Jun-10** | **Jul-10** | **Aug-10** | **Sep-10** | **Oct-10** | **Nov-10** |
| **Lakeshore Townhouse Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 18 | 18 | 18 | 17 | 17 | 16 | 16 | 15 |
| Total Units Sold | 0 | 0 | 0 | 1 | 1 | 2 | 2 | 3 |
| Avg. Sales Price | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 |
| Units Sold This Period | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 |
| Sales Revenue | $0 | $0 | $200,000 | $0 | $200,000 | $0 | $200,000 | $0 |
| Commissions | 0 | 0 | (10,000) | 0 | (10,000) | 0 | (10,000) | 0 |
| Closing Cost | 0 | 0 | (3,000) | 0 | (3,000) | 0 | (3,000) | 0 |
| Ad Valorem Taxes on Sold Units | 0 | 0 | (2,395) | 0 | (3,353) | 0 | (4,311) | 0 |
| **Net Sales Proceeds** | $0 | $0 | $184,605 | $0 | $183,647 | $0 | $182,689 | $0 |
| | | | | | | | | |
| **Other income/expense** | | | | | | | | |
| Rental Income | 3,800 | 5,600 | 5,600 | 7,400 | 7,400 | 7,400 | 9,200 | 9,200 |
| Project Overhead | (7,200) | (7,200) | (7,200) | (6,800) | (6,800) | (6,400) | (6,400) | (6,000) |
| HOA Dues | (1,530) | (1,530) | (1,530) | (1,445) | (1,445) | (1,360) | (1,360) | (1,275) |
| Construction costs | (52,000) | (52,000) | (52,000) | 0 | 0 | 0 | 0 | 0 |
| Ad Valorem Taxes on Inventory | (103,548) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Expenses** | ($160,478) | ($55,130) | ($55,130) | ($845) | ($845) | ($360) | $1,440 | $1,925 |
| | | | | | | | | |
| **Net cash flow** | ($160,478) | ($55,130) | $129,475 | ($845) | $182,802 | ($360) | $184,129 | $1,925 |
| | | | | | | | | |
| **Lakeshore Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 107 | 107 | 107 | 107 | 103 | 103 | 103 | 102 |
| Total Units Sold | - | | | | | | | 1 |
| Avg. Sales Price | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| Units Sold This Period | | | | 4 | | - | 1 | 1 |
| Sales Revenue | $0 | $0 | $0 | $80,000 | $0 | $0 | $20,000 | $20,000 |
| Commissions | $0 | $0 | $0 | ($1,600) | $0 | $0 | ($400) | ($400) |
| Closing Cost | $0 | $0 | $0 | ($400) | $0 | $0 | ($100) | ($100) |
| Ad Valorem Taxes on Sold Units | $0 | $0 | $0 | ($1,148) | $0 | $0 | ($431) | ($479) |
| **Net Sales Proceeds** | $0 | $0 | $0 | $76,852 | $0 | $0 | $19,069 | $19,022 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Project Overhead | ($535) | ($535) | ($535) | ($535) | ($515) | ($515) | ($516) | ($510) |
| Ad Valorem Taxes on Inventory | ($60,300) | | | | | | | |
| **Total Expenses** | ($60,835) | ($535) | ($535) | ($535) | ($515) | ($515) | ($516) | ($510) |
| | | | | | | | | |
| **Net cash flow** | ($60,835) | ($535) | ($535) | $76,317 | ($515) | ($515) | $18,554 | $18,512 |

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Month | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Period Ending | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 |
| **Myers Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 35 | 33 | 32 | 31 | 30 | 29 | 27 | 25 |
| Total Units Sold | - | 2 | 3 | 4 | 5 | 6 | 8 | 10 |
| Avg. Sales Price | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 |
| Units Sold This Period | | 2 | 1 | 1 | 1 | 1 | 2 | 2 |
| Sales Revenue | $0 | $105,000 | $52,500 | $52,500 | $52,500 | $52,500 | $105,000 | $105,000 |
| Interest recovery | $0 | $4,893 | $2,759 | $3,061 | $3,373 | $3,685 | $7,974 | $8,598 |
| Property tax recovery | $0 | $384 | $192 | $192 | $192 | $192 | $384 | $384 |
| Roadway Impact reimbursement (25.5 lots) | $0 | $3,990 | $1,995 | $1,995 | $1,995 | $1,995 | $3,990 | $3,990 |
| Credit for earnest money deposit | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Closing Cost | $0 | ($525) | ($263) | ($263) | ($263) | ($263) | ($525) | ($525) |
| Ad Valorem Taxes on Sold Units | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Sales Proceeds | $0 | $113,743 | $57,183 | $57,486 | $57,798 | $58,110 | $116,824 | $117,448 |
| **Expenses** | | | | | | | | |
| Project Overhead | ($80) | ($75) | ($73) | ($71) | ($69) | ($66) | ($62) | ($57) |
| HOA Dues | ($1,167) | ($1,100) | ($1,067) | ($1,033) | ($1,000) | ($987) | ($900) | ($833) |
| Ad Valorem Taxes on Inventory | | | | | | | | |
| Total Expenses | ($1,247) | ($1,175) | ($1,140) | ($1,104) | ($1,069) | ($1,033) | ($962) | ($890) |
| Net cash flow | ($1,247) | $112,567 | $56,044 | $56,381 | $56,729 | $57,077 | $115,862 | $116,557 |
| TOTAL NET SALE PROCEEDS | $0 | $113,743 | $241,788 | $134,337 | $241,445 | $58,110 | $318,582 | $136,469 |
| TOTAL NET CASH FLOW | ($222,560) | $56,902 | $184,984 | $131,853 | $239,016 | $56,202 | $318,545 | $136,994 |
| Interest Expense - Bank Loans | $17,166 | $17,166 | $16,924 | $16,411 | $16,125 | $15,612 | $15,489 | $14,812 |
| **Bank Loans** | | | | | | | | |
| Advances | | | | | | | | |
| Payments (85% of net proceeds of sales) | $0 | $98,681 | $205,520 | $114,187 | $205,228 | $49,393 | $270,795 | $115,999 |
| Balance  $8,866,459 | $8,866,459 | $6,769,778 | $6,564,258 | $6,450,071 | $6,244,843 | $6,195,450 | $5,924,655 | $5,808,656 |
| **Unsecured Creditor Debt** | | | | | | | | |
| Payments | $4,991 | $4,991 | $4,991 | $4,991 | $4,991 | $4,991 | $4,991 | $4,991 |
| Balance  $89,841 | $84,850 | $79,859 | $74,868 | $69,876 | $64,885 | $59,894 | $54,903 | $49,912 |
| Net Cash Flow after Debt Service (P&I) | ($244,717) | ($81,936) | ($42,452) | ($3,735) | $12,672 | ($13,795) | $27,271 | $1,192 |
| Prior month distribution | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Balance (negatives to be funded from new equit) | ($244,717) | ($306,653) | ($349,105) | ($352,841) | ($340,169) | ($353,964) | ($326,693) | ($325,501) |
| **Equity** | | | | | | | | |
| Contributions (Distributions) | $244,717 | $61,936 | $42,452 | $3,735 | $0 | $1,123 | $0 | $0 |
| Balance | $244,717 | $306,653 | $349,105 | $352,841 | $352,841 | $353,964 | $353,964 | $353,964 |

3/25/10
lakeshore projection 7-03.xls

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| Period | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|
| Month | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Period Ending | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 |
| **Lakeshore Townhouse Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 15 | 14 | 14 | 13 | 13 | 12 | 12 | 11 |
| Total Units Sold | 3 | 1 | 4 | 3 | 5 | 6 | 6 | 7 |
| Avg. Sales Price | $200,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $225,000 | $236,000 |
| Units Sold This Period | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 |
| Sales Revenue | $200,000 | $0 | $225,000 | $0 | $225,000 | $0 | $225,000 | $0 |
| Commissions | (10,000) | 0 | (11,250) | 0 | (11,250) | 0 | (11,250) | 0 |
| Closing Cost | (3,000) | 0 | (3,375) | 0 | (3,375) | 0 | (3,375) | 0 |
| Ad Valorem Taxes on Sold Units | (5,269) | 0 | (479) | 0 | (1,437) | 0 | (2,395) | 0 |
| Net Sales Proceeds | $181,731 | $0 | $209,896 | $0 | $208,938 | $0 | $207,980 | $0 |
| | | | | | | | | |
| **Other Income/expense** | | | | | | | | |
| Rental Income | 9,200 | 9,200 | 7,400 | 7,400 | 7,400 | 7,400 | 5,600 | 5,600 |
| Project Overhead | (6,000) | (5,600) | (5,600) | (5,200) | (5,200) | (4,800) | (4,800) | (4,400) |
| HOA Dues | (1,275) | (1,190) | (1,190) | (1,105) | (1,105) | (1,020) | (1,020) | (935) |
| Construction costs | | (86,220) | | | | | | |
| Ad Valorem Taxes on Inventory | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Expenses | $1,925 | ($83,810) | $610 | $1,095 | $1,095 | $1,580 | ($220) | $265 |
| | | | | | | | | |
| Net cash flow | $183,656 | ($83,810) | $210,506 | $1,095 | $210,033 | $1,580 | $207,760 | $265 |
| | | | | | | | | |
| **Lakeshore Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 101 | 100 | 99 | 98 | 97 | 96 | 95 | 94 |
| Total Units Sold | | | | | | | | |
| Avg. Sales Price | $20,000 | $22,500 | $22,500 | $22,500 | $22,500 | $22,500 | $22,500 | $22,500 |
| Units Sold This Period | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 |
| Sales Revenue | $20,000 | $22,500 | $22,500 | $22,500 | $22,500 | $22,500 | $22,500 | $45,000 |
| Commissions | ($400) | ($450) | ($450) | ($450) | ($450) | ($450) | ($450) | ($900) |
| Closing Cost | ($100) | ($113) | ($113) | ($113) | ($113) | ($113) | ($113) | ($225) |
| Ad Valorem Taxes on Sold Units | ($626) | $0 | ($48) | ($98) | ($144) | ($191) | ($239) | ($574) |
| Net Sales Proceeds | $18,974 | $21,938 | $21,890 | $21,842 | $21,794 | $21,746 | $21,698 | $43,301 |
| | | | | | | | | |
| **Expenses** | | | | | | | | |
| Project Overhead | ($505) | ($500) | ($495) | ($490) | ($485) | ($480) | ($476) | ($470) |
| Ad Valorem Taxes on Inventory | | ($57,994) | | | | | | |
| Total Expenses | ($505) | ($58,494) | ($495) | ($490) | ($485) | ($480) | ($475) | ($470) |
| | | | | | | | | |
| Net cash flow | $18,469 | ($36,557) | $21,395 | $21,352 | $21,309 | $21,266 | $21,223 | $42,831 |

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| Period | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|
| Month | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Period Ending | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 |
| **Myers Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 24 | 23 | 22 | 21 | 20 | 19 | 18 | 16 |
| Total Units Sold | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 19 |
| Avg. Sales Price | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 |
| Units Sold This Period | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 |
| Sales Revenue | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $105,000 |
| Interest recovery | $4,601 | $4,913 | $5,226 | $5,607 | $5,820 | $6,122 | $6,434 | $13,472 |
| Property tax recovery | $192 | $192 | $192 | $192 | $192 | $769 | $769 | $1,538 |
| Roadway Impact reimbursement (25.5 lots) | $1,995 | $1,995 | $1,995 | $1,995 | $1,995 | $1,995 | $1,995 | $3,990 |
| Credit for earnest money deposit | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Closing Cost | ($263) | ($263) | ($263) | ($263) | ($263) | ($263) | ($263) | ($525) |
| Ad Valorem Taxes on Sold Units | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Sales Proceeds | $59,026 | $59,338 | $59,660 | $59,932 | $60,244 | $61,123 | $61,435 | $123,474 |
| **Expenses** | | | | | | | | |
| Project Overhead | ($55) | ($53) | ($50) | ($48) | ($46) | ($43) | ($41) | ($37) |
| HOA Dues | ($800) | ($767) | ($733) | ($700) | ($667) | ($633) | ($800) | ($533) |
| Ad Valorem Taxes on Inventory | | ($13,840) | | | | | | |
| Total Expenses | ($855) | ($14,659) | ($784) | ($748) | ($712) | ($677) | ($641) | ($570) |
| **Net cash flow** | $58,171 | $44,679 | $58,867 | $59,184 | $59,532 | $60,446 | $60,794 | $122,904 |
| TOTAL NET SALE PROCEEDS | $259,731 | $81,276 | $291,436 | $81,774 | $290,976 | $82,869 | $291,113 | $166,775 |
| TOTAL NET CASH FLOW | $280,296 | ($75,687) | $290,767 | $81,631 | $290,874 | $83,292 | $289,777 | $166,000 |
| Interest Expense - Bank Loans | $14,522 | $13,970 | $13,797 | $13,178 | $13,004 | $12,386 | $12,210 | $11,591 |
| **Bank Loans** | | | | | | | | |
| Advances | | | | | | | | |
| Payments (85% of net proceeds of sales) | $220,771 | $69,084 | $247,721 | $69,508 | $247,330 | $70,439 | $247,446 | $141,759 |
| Balance ($6,866,459) | $5,587,885 | $5,618,801 | $5,271,080 | $5,201,573 | $4,954,243 | $4,883,804 | $4,636,358 | $4,494,599 |
| **Unsecured Creditor Debt** | | | | | | | | |
| Payments | $4,991 | $4,991 | $4,991 | $4,991 | $4,991 | $4,991 | $4,991 | $4,991 |
| Balance ($89,841) | $44,921 | $39,929 | $34,938 | $29,947 | $24,956 | $19,965 | $14,974 | $9,982 |
| Net Cash Flow after Debt Service (P&I) | $20,012 | ($163,733) | $24,259 | ($6,046) | $25,549 | ($4,523) | $25,130 | $7,669 |
| Prior month distribution | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Balance (negatives to be funded from new equil) | ($305,489) | ($469,222) | ($444,963) | ($451,009) | ($425,460) | ($429,983) | ($404,853) | ($397,193) |
| **Equity** | | | | | | | | |
| Contributions (Distributions) | $0 | $115,258 | $0 | $0 | $0 | $0 | $0 | $0 |
| Balance | $353,964 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 |

| Period | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|
| Month | 8 | 9 | 10 | 11 | 12 | 1 | 2 | 3 |
| Period Ending | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 |
| **Lakeshore Townhouse Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 11 | 10 | 9 | 8 | 7 | 6 | 5 | 4 |
| Total Units Sold | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| Avg. Sales Price | $236,000 | $236,000 | $236,000 | $236,000 | $236,000 | $247,000 | $247,000 | $247,000 |
| Units Sold This Period | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Sales Revenue | $236,000 | $236,000 | $236,000 | $236,000 | $236,000 | $247,000 | $247,000 | $247,000 |
| Commissions | (11,800) | (11,800) | (11,800) | (11,800) | (11,800) | (12,350) | (12,350) | (12,350) |
| Closing Cost | (3,540) | (3,540) | (3,540) | (3,540) | (3,540) | (3,705) | (3,705) | (3,705) |
| Ad Valorem Taxes on Sold Units | (3,353) | (3,832) | (4,311) | (4,790) | (5,269) | 0 | (479) | (958) |
| Net Sales Proceeds | $217,307 | $216,828 | $216,349 | $215,870 | $215,391 | $230,945 | $230,486 | $229,987 |
| **Other income/expense** | | | | | | | | |
| Rental Income | 5,600 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 1,900 | 1,900 |
| Project Overhead | (4,400) | (4,000) | (3,600) | (3,200) | (2,800) | (2,400) | (2,000) | (1,600) |
| HOA Dues | (935) | (850) | (765) | (680) | (595) | (510) | (426) | (340) |
| Construction costs | | | | | | | | |
| Ad Valorem Taxes on Inventory | 0 | 0 | 0 | 0 | 0 | (40,236) | 0 | 0 |
| Total Expenses | $265 | ($1,050) | ($565) | ($80) | $405 | ($39,346) | ($525) | ($40) |
| Net cash flow | $217,572 | $215,778 | $215,784 | $215,790 | $215,796 | $191,599 | $229,941 | $229,947 |
| **Lakeshore Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 92 | 90 | 88 | 86 | 84 | 82 | 80 | 78 |
| Total Units Sold | | | | | | | | |
| Avg. Sales Price | $22,500 | $22,500 | $22,500 | $22,500 | $22,500 | $24,750 | $24,750 | $24,750 |
| Units Sold This Period | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Sales Revenue | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $49,500 | $49,500 | $49,500 |
| Commissions | ($900) | ($900) | ($900) | ($900) | ($900) | ($990) | ($990) | ($990) |
| Closing Cost | ($225) | ($225) | ($225) | ($225) | ($225) | ($248) | ($248) | ($248) |
| Ad Valorem Taxes on Sold Units | ($670) | ($766) | ($861) | ($957) | ($1,053) | $0 | ($96) | ($191) |
| Net Sales Proceeds | $43,205 | $43,109 | $43,014 | $42,918 | $42,822 | $48,263 | $48,167 | $48,071 |
| **Expenses** | | | | | | | | |
| Project Overhead | ($460) | ($450) | ($440) | ($430) | ($420) | ($410) | ($400) | ($390) |
| Ad Valorem Taxes on Inventory | | | | | | ($48,233) | | |
| Total Expenses | ($460) | ($450) | ($440) | ($430) | ($420) | ($48,643) | ($400) | ($390) |
| Net cash flow | $42,745 | $42,659 | $42,574 | $42,488 | $42,402 | ($380) | $47,767 | $47,681 |

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

3/2010
lakeshore projection 7-52.xls

| Period | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|
| Month | 8 | 9 | 10 | 11 | 12 | 1 | 2 | 3 |
| Period Ending | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Mar-12 |
| **Myers Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 14 | 12 | 10 | 8 | 7 | 6 | 5 | 4 |
| Total Units Sold | 21 | 23 | 25 | 27 | 28 | 29 | 30 | 31 |
| Avg. Sales Price | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 |
| Units Sold This Period | 2 | 2 | 2 | 2 | 1 | 1 | 1 | 1 |
| Sales Revenue | 105,000 | 105,000 | 105,000 | 105,000 | 52,500 | 52,500 | 52,500 | 52,500 |
| Interest recovery | 14,096 | 14,720 | 15,324 | 15,948 | 8,276 | 8,588 | 8,901 | 9,193 |
| Property tax recovery | 1,538 | 1,538 | 1,538 | 1,538 | 769 | 769 | 769 | 769 |
| Roadway Impact reimbursement (25.5 lots) | 3,990 | 3,990 | 3,990 | $0 | $0 | $0 | $0 | $0 |
| Credit for earnest money deposit | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Closing Cost | ($525) | ($525) | ($525) | ($525) | ($263) | ($263) | ($263) | ($263) |
| Ad Valorem Taxes on Sold Units | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Sales Proceeds | $124,099 | $124,723 | $125,327 | $121,961 | $61,283 | $61,595 | $61,907 | $62,199 |
| **Expenses** | | | | | | | | |
| Project Overhead | ($32) | ($27) | ($23) | ($18) | ($16) | ($14) | ($11) | ($9) |
| HOA Dues | ($467) | ($400) | ($333) | ($267) | ($233) | ($200) | ($167) | ($133) |
| Ad Valorem Taxes on Inventory | | | | | | ($4,037) | | |
| Total Expenses | ($499) | ($427) | ($356) | ($285) | ($249) | ($4,250) | ($178) | ($142) |
| Net cash flow | $123,600 | $124,295 | $124,971 | $121,676 | $61,033 | $57,345 | $61,729 | $62,056 |
| **TOTAL NET SALE PROCEEDS** | $384,611 | $384,660 | $384,690 | $380,749 | $319,496 | $340,802 | $340,540 | $340,257 |
| **TOTAL NET CASH FLOW** | $383,917 | $382,733 | $383,328 | $379,954 | $319,232 | $248,563 | $339,437 | $339,685 |
| Interest Expense – Bank Loans | $11,236 | $10,419 | $9,802 | $8,784 | $7,975 | $7,286 | $6,572 | $5,848 |
| **Bank Loans** | | | | | | | | |
| Advances | | | | | | | | |
| Payments (85% of net proceeds of sales) | $326,919 | $326,961 | $326,986 | $323,637 | $271,572 | $289,682 | $289,459 | $289,218 |
| Balance $6,866,459 | $4,167,680 | $3,840,718 | $3,513,732 | $3,190,095 | $2,918,524 | $2,628,842 | $2,339,383 | $2,050,165 |
| **Unsecured Creditor Debt** | | | | | | | | |
| Payments | $4,991 | $4,991 | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) |
| Balance $89,841 | $4,991 | | | | | | | |
| Net Cash Flow after Debt Service (P&I) | $40,770 | $40,361 | $46,740 | $47,533 | $39,685 | ($48,415) | $43,406 | $44,618 |
| Prior month distribution | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Balance (negatives to be funded from new equity) | ($356,423) | ($316,062) | ($289,321) | ($221,788) | ($182,104) | ($230,519) | ($187,113) | ($142,495) |
| **Equity** | | | | | | | | |
| Contributions (Distributions) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Balance | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 |

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| Period | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 |
|---|---|---|---|---|---|---|---|---|
| Month | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Period Ending | Apr-12 | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 |
| **Lakeshore Townhouse Sales** | | | | | | | | |
| Sales | | | | | | | | |
| Total Units Remaining | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 |
| Total Units Sold | 15 | 16 | 17 | 18 | 18 | 18 | 18 | 18 |
| Avg. Sales Price | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 |
| Units Sold This Period | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| Sales Revenue | $247,000 | $247,000 | $247,000 | $0 | $0 | $0 | $0 | $0 |
| Commissions | (12,350) | (12,350) | (12,350) | 0 | 0 | 0 | 0 | 0 |
| Closing Cost | (3,705) | (3,705) | (3,705) | 0 | 0 | 0 | 0 | 0 |
| Ad Valorem Taxes on Sold Units | (1,437) | (1,916) | (2,395) | 0 | 0 | 0 | 0 | 0 |
| Net Sales Proceeds | $229,508 | $229,029 | $228,550 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| Other income/expense | | | | | | | | |
| Rental Income | | | | | | | | |
| Project Overhead | (1,200) | (800) | (400) | | | | | |
| HOA Dues | (255) | (170) | (85) | | | | | |
| Construction costs | | | | | | | | |
| Ad Valorem Taxes on Inventory | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Expenses | ($1,455) | ($970) | ($485) | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| Net cash flow | $228,053 | $228,059 | $228,065 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| **Lakeshore Lot Sales** | | | | | | | | |
| Sales | | | | | | | | |
| Total Units Remaining | 76 | 74 | 72 | 70 | 68 | 65 | 63 | 60 |
| Total Units Sold | 2 | 2 | 2 | 2 | 3 | 2 | 3 | 2 |
| Avg. Sales Price | $24,750 | $24,750 | $24,750 | $24,750 | $24,750 | $24,750 | $24,750 | $24,750 |
| Units Sold This Period | 2 | 2 | 2 | 2 | 3 | 2 | 3 | 2 |
| Sales Revenue | $49,500 | $49,500 | $49,500 | $49,500 | $74,250 | $49,500 | $74,250 | $49,500 |
| Commissions | ($990) | ($990) | ($990) | ($990) | ($1,485) | ($990) | ($1,485) | ($990) |
| Closing Cost | ($248) | ($248) | ($248) | ($248) | ($371) | ($248) | ($371) | ($248) |
| Ad Valorem Taxes on Sold Units | ($287) | ($383) | ($479) | ($574) | ($1,005) | ($766) | ($1,292) | ($957) |
| Net Sales Proceeds | $47,975 | $47,880 | $47,784 | $47,688 | $71,389 | $47,497 | $71,102 | $47,306 |
| | | | | | | | | |
| Expenses | | | | | | | | |
| Project Overhead | ($380) | ($370) | ($360) | ($350) | ($340) | ($325) | ($315) | ($300) |
| Ad Valorem Taxes on Inventory | | | | | | | | |
| Total Expenses | ($380) | ($370) | ($360) | ($350) | ($340) | ($325) | ($315) | ($300) |
| | | | | | | | | |
| Net cash flow | $47,595 | $47,510 | $47,424 | $47,338 | $71,049 | $47,172 | $70,787 | $47,006 |

3/12/210
lakeshore projection 7-00.xls

| Period | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 |
|---|---|---|---|---|---|---|---|---|
| Month | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Period Ending | Apr-12 | May-12 | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 |
| **Myers Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 |
| Total Units Sold | 32 | 33 | 34 | 35 | 35 | 35 | 35 | 35 |
| Avg. Sales Price | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 |
| Units Sold This Period | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 |
| Sales Revenue | 52,500 | 52,500 | 52,500 | 52,500 | $0 | $0 | $0 | $0 |
| Interest recovery | 9,505 | 9,807 | 10,119 | 10,421 | $0 | $0 | $0 | $0 |
| Property tax recovery | 769 | 1,346 | 1,346 | 1,346 | $0 | $0 | $0 | $0 |
| Roadway Impact reimbursement (25.5 lots) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Credit for earnest money deposit | $0 | $0 | $0 | ($7,500) | $0 | $0 | $0 | $0 |
| Closing Cost | ($263) | ($263) | ($263) | ($263) | $0 | $0 | $0 | $0 |
| Ad Valorem Taxes on Sold Units | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Sales Proceeds | $62,511 | $63,390 | $63,702 | $56,504 | $0 | $0 | $0 | $0 |
| **Expenses** | | | | | | | | |
| Project Overhead | ($7) | ($5) | ($2) | $0 | $0 | $0 | $0 | $0 |
| HOA Dues | ($100) | ($67) | ($33) | $0 | $0 | $0 | $0 | $0 |
| Ad Valorem Taxes on Inventory | | | | | | | | |
| Total Expenses | ($107) | ($71) | ($36) | $0 | $0 | $0 | $0 | $0 |
| Net cash flow | $62,404 | $63,318 | $63,666 | $56,504 | $0 | $0 | $0 | $0 |
| TOTAL NET SALE PROCEEDS | $339,994 | $340,298 | $340,036 | $104,192 | $71,389 | $47,497 | $71,102 | $47,306 |
| TOTAL NET CASH FLOW | $338,053 | $338,887 | $339,155 | $103,842 | $71,049 | $47,172 | $70,787 | $47,006 |
| Interest Expense - Bank Loans | $5,125 | $4,403 | $3,680 | $2,957 | $2,736 | $2,584 | $2,483 | $2,332 |
| **Bank Loans** | | | | | | | | |
| Advances | | | | | | | | |
| Payments (85% of net proceeds of sales) | $288,995 | $289,254 | $289,030 | $88,563 | $60,681 | $40,372 | $60,437 | $40,210 |
| Balance $6,866,459 | $1,761,169 | $1,471,916 | $1,182,885 | $1,094,322 | $1,033,641 | $993,269 | $932,832 | $892,623 |
| **Unsecured Creditor Debt** | | | | | | | | |
| Payments | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) |
| Balance $89,841 | | | | | | | | |
| Net Cash Flow after Debt Service (P&I) | $43,932 | $45,231 | $46,445 | $12,322 | $7,633 | $4,216 | $7,867 | $4,464 |
| Prior month distribution | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Balance (negatives to be funded from new equit) | ($98,563) | ($53,333) | ($6,888) | $5,434 | $13,066 | $17,282 | $25,149 | $29,613 |
| **Equity** | | | | | | | | |
| Contributions (Distributions) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Balance | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 |

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |
|---|---|---|---|---|---|---|---|---|
| Period | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Month | | | | | | | | |
| Period Ending | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 |
| **Lakeshore Townhouse Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Units Sold | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 |
| Avg. Sales Price | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 |
| Units Sold This Period | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Commissions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Closing Cost | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ad Valorem Taxes on Sold Units | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Sales Proceeds | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Other income/expense** | | | | | | | | |
| Rental Income | | | | | | | | |
| Project Overhead | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HOA Dues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Construction costs | | | | | | | | |
| Ad Valorem Taxes on Inventory | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net cash flow | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Lakeshore Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 58 | 55 | 53 | 51 | 49 | 47 | 45 | 43 |
| Total Units Sold | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Avg. Sales Price | $24,750 | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 |
| Units Sold This Period | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Sales Revenue | $74,250 | $54,450 | $54,450 | $54,450 | $54,450 | $54,450 | $54,450 | $54,450 |
| Commissions | ($1,485) | ($1,089) | ($1,089) | ($1,089) | ($1,089) | ($1,089) | ($1,089) | ($1,089) |
| Closing Cost | ($371) | ($272) | ($272) | ($272) | ($272) | ($272) | ($272) | ($272) |
| Ad Valorem Taxes on Sold Units | ($1,579) | $0 | ($96) | ($191) | ($287) | ($383) | ($479) | ($574) |
| Net Sales Proceeds | $70,815 | $53,089 | $52,993 | $52,897 | $52,802 | $52,706 | $52,610 | $52,515 |
| **Expenses** | | | | | | | | |
| Project Overhead | ($290) | ($275) | ($265) | ($255) | ($245) | ($235) | ($225) | ($215) |
| Ad Valorem Taxes on Inventory | | ($33,304) | | | | | | |
| Total Expenses | ($290) | ($33,579) | ($265) | ($255) | ($245) | ($235) | ($225) | ($215) |
| Net cash flow | $70,525 | $19,510 | $52,728 | $52,642 | $52,557 | $52,471 | $52,385 | $52,300 |

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| Period |  | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 |
|---|---|---|---|---|---|---|---|---|---|
| Month |  | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Period Ending |  | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 |
| **Myers Lot Sales** |  |  |  |  |  |  |  |  |  |
| **Sales** |  |  |  |  |  |  |  |  |  |
| Total Units Remaining |  | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Units Sold |  | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 |
| Avg. Sales Price |  | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 |
| Units Sold This Period |  | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 |
| Sales Revenue |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Interest recovery |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Property tax recovery |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Roadway Impact reimbursement (25.5 lots) |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Credit for earnest money deposit |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Closing Cost |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ad Valorem Taxes on Sold Units |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Sales Proceeds |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Expenses** |  |  |  |  |  |  |  |  |  |
| Project Overhead |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| HOA Dues |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ad Valorem Taxes on Inventory |  |  |  |  |  |  |  |  |  |
| Total Expenses |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net cash flow |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TOTAL NET SALE PROCEEDS |  | $70,815 | $53,089 | $52,993 | $52,897 | $52,802 | $52,706 | $52,610 | $52,515 |
| TOTAL NET CASH FLOW |  | $70,525 | $19,510 | $52,728 | $52,642 | $52,557 | $52,471 | $52,385 | $52,300 |
| Interest Expense - Bank Loans |  | $2,232 | $2,081 | $1,968 | $1,856 | $1,743 | $1,631 | $1,519 | $1,407 |
| **Bank Loans** |  |  |  |  |  |  |  |  |  |
| Advances |  |  |  |  |  |  |  |  |  |
| Payments (85% of net proceeds of sales) |  | $60,192 | $45,125 | $45,044 | $44,953 | $44,881 | $44,800 | $44,719 | $44,637 |
| Balance | $6,866,459 | $832,430 | $787,305 | $742,261 | $697,298 | $652,417 | $607,616 | $562,898 | $518,260 |
| **Unsecured Creditor Debt** |  |  |  |  |  |  |  |  |  |
| Payments |  |  |  |  |  |  |  |  |  |
| Balance | $89,841 | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) |
| Net Cash Flow after Debt Service (P&I) |  | $8,101 | ($27,696) | $6,716 | $5,824 | $5,932 | $6,040 | $6,147 | $6,255 |
| Prior month distribution |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Balance (negatives to be funded from new equit |  | $37,713 | $10,017 | $16,733 | $21,557 | $27,489 | $33,528 | $39,676 | $45,931 |
| **Equity** |  |  |  |  |  |  |  |  |  |
| Contributions (Distributions) |  | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Balance |  | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 |

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| Period | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 |
|---|---|---|---|---|---|---|---|---|
| Month | 8 | 9 | 10 | 11 | 12 | 1 | 2 | 3 |
| Period Ending | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 |
| **Lakeshore Townhouse Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Units Sold | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 |
| Avg. Sales Price | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 |
| Units Sold This Period | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Commissions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Closing Cost | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ad Valorem Taxes on Sold Units | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Sales Proceeds | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Other income/expense** | | | | | | | | |
| Rental Income | | | | | | | | |
| Project Overhead | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HOA Dues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Construction costs | | | | | | | | |
| Ad Valorem Taxes on Inventory | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net cash flow | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Lakeshore Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 41 | 39 | 36 | 33 | 31 | 28 | 26 | 24 |
| Total Units Sold | 3 | 2 | 3 | 3 | 3 | 2 | 2 | 2 |
| Avg. Sales Price | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 |
| Units Sold This Period | 3 | 2 | 3 | 3 | 3 | 2 | 2 | 2 |
| Sales Revenue | $81,675 | $54,450 | $81,675 | $54,450 | $81,675 | $54,450 | $54,450 | $54,450 |
| Commissions | ($1,634) | ($1,089) | ($1,634) | ($1,089) | ($1,634) | ($1,089) | ($1,089) | ($1,089) |
| Closing Cost | ($408) | ($272) | ($408) | ($272) | ($408) | ($272) | ($272) | ($272) |
| Ad Valorem Taxes on Sold Units | ($1,005) | ($766) | ($1,292) | ($957) | ($1,579) | $0 | ($96) | ($191) |
| Net Sales Proceeds | $78,628 | $52,323 | $78,341 | $52,132 | $78,054 | $53,089 | $52,993 | $52,897 |
| **Expenses** | | | | | | | | |
| Project Overhead | ($205) | ($190) | ($180) | ($165) | ($155) | ($140) | ($130) | ($120) |
| Ad Valorem Taxes on Inventory | | | | | | ($17,800) | | |
| Total Expenses | ($205) | ($190) | ($180) | ($165) | ($155) | ($17,940) | ($130) | ($120) |
| Net cash flow | $78,423 | $52,133 | $78,161 | $51,967 | $77,899 | $35,149 | $52,863 | $52,777 |

3/13/2010
lakeshore projection 7-09.xls

| Period | | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 |
|---|---|---|---|---|---|---|---|---|---|
| Month | | 8 | 9 | 10 | 11 | 12 | 1 | 2 | 3 |
| Period Ending | | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 |
| **Myers Lot Sales** | | | | | | | | | |
| **Sales** | | | | | | | | | |
| Total Units Remaining | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Units Sold | | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 |
| Avg. Sales Price | | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 |
| Units Sold This Period | | | | | | | | | |
| Sales Revenue | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Interest recovery | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Property tax recovery | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Roadway Impact reimbursement (25.5 lots) | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Credit for earnest money deposit | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Closing Cost | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ad Valorem Taxes on Sold Units | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Sales Proceeds | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Expenses** | | | | | | | | | |
| Project Overhead | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| HOA Dues | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ad Valorem Taxes on Inventory | | | | | | | | | |
| Total Expenses | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net cash flow | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TOTAL NET SALE PROCEEDS | | $78,628 | $52,323 | $78,341 | $52,132 | $78,054 | $63,089 | $52,993 | $52,897 |
| TOTAL NET CASH FLOW | | $78,423 | $52,133 | $78,161 | $51,987 | $77,899 | $35,149 | $52,863 | $52,777 |
| Interest Expense - Bank Loans | | $1,296 | $1,129 | $1,017 | $851 | $740 | $574 | $461 | $349 |
| **Bank Loans** | | | | | | | | | |
| Advances | | | | | | | | | |
| Payments (85% of net proceeds of sales) | | $66,834 | $44,475 | $66,590 | $44,312 | $66,346 | $45,125 | $45,044 | $44,963 |
| Balance | $6,866,459 | $451,426 | $406,952 | $340,362 | $296,050 | $229,704 | $184,578 | $139,534 | $94,571 |
| **Unsecured Creditor Debt** | | | | | | | | | |
| Payments | | | | | | | | | |
| Balance | $89,841 | ($0) | ($0) | ($0) | ($0) | ($0) | | ($0) | ($0) |
| Net Cash Flow after Debt Service (P&I) | | $10,294 | $6,530 | $10,554 | $6,804 | $10,813 | ($10,551) | $7,358 | $7,466 |
| Prior month distribution | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Balance (negatives to be funded from new equity) | | $56,224 | $62,754 | $73,308 | $80,112 | $90,925 | $80,374 | $87,731 | $95,197 |
| **Equity** | | | | | | | | | |
| Contributions (Distributions) | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Balance | | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 | $469,222 |

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

3/2/2010
lakeshore projection 7-05.xls

| Period | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 |
|---|---|---|---|---|---|---|---|---|
| Month | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Period Ending | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 |
| **Lakeshore Townhouse Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Units Sold | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 |
| Avg. Sales Price | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 | $247,000 |
| Units Sold This Period | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sales Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Commissions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Closing Cost | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ad Valorem Taxes on Sold Units | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Sales Proceeds | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Other income/expense** | | | | | | | | |
| Rental Income | | | | | | | | |
| Project Overhead | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HOA Dues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Construction costs | | | | | | | | |
| Ad Valorem Taxes on Inventory | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net cash flow | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Lakeshore Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 22 | 20 | 18 | 16 | 14 | 11 | 9 | 6 |
| Total Units Sold | | | | | | | | |
| Avg. Sales Price | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 | $27,225 |
| Units Sold This Period | 2 | 2 | 2 | 2 | 3 | 2 | 3 | 2 |
| Sales Revenue | $54,450 | $54,450 | $54,450 | $54,450 | $81,675 | $54,450 | $81,675 | $54,450 |
| Commissions | ($1,089) | ($1,089) | ($1,089) | ($1,089) | ($1,634) | ($1,089) | ($1,634) | ($1,089) |
| Closing Cost | ($272) | ($272) | ($272) | ($272) | ($408) | ($272) | ($408) | ($272) |
| Ad Valorem Taxes on Sold Units | ($287) | ($383) | ($479) | ($574) | ($1,005) | ($766) | ($1,292) | ($957) |
| Net Sales Proceeds | $52,802 | $52,706 | $52,610 | $52,515 | $78,628 | $52,323 | $78,341 | $52,132 |
| **Expenses** | | | | | | | | |
| Project Overhead | ($110) | ($100) | ($90) | ($80) | ($70) | ($55) | ($45) | ($30) |
| Ad Valorem Taxes on Inventory | | | | | | | | |
| Total Expenses | ($110) | ($100) | ($90) | ($80) | ($70) | ($55) | ($45) | ($30) |
| Net cash flow | $52,692 | $52,606 | $52,520 | $52,435 | $78,558 | $52,268 | $78,296 | $52,102 |

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| Period | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 |
|---|---|---|---|---|---|---|---|---|
| Month | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| Period Ending | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 |
| **Myers Lot Sales** | | | | | | | | |
| **Sales** | | | | | | | | |
| Total Units Remaining | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Units Sold | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 |
| Avg. Sales Price | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 |
| Units Sold This Period | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Sales Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Interest recovery | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Property tax recovery | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Roadway Impact reimbursement (25.5 lots) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Credit for earnest money deposit | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Closing Cost | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ad Valorem Taxes on Sold Units | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Sales Proceeds | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Expenses** | | | | | | | | |
| Project Overhead | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| HOA Dues | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ad Valorem Taxes on Inventory | | | | | | | | |
| Total Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net cash flow | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **TOTAL NET SALE PROCEEDS** | $52,802 | $52,706 | $52,610 | $52,515 | $78,628 | $52,323 | $78,341 | $52,132 |
| **TOTAL NET CASH FLOW** | $52,692 | $52,806 | $52,920 | $52,435 | $78,558 | $52,288 | $78,296 | $52,102 |
| Interest Expense - Bank Loans | $236 | $124 | $12 | $0 | $0 | $0 | $0 | $0 |
| **Bank Loans** | | | | | | | | |
| Advances | | | | | | | | |
| Payments (85% of net proceeds of sales) | $44,881 | $44,800 | $4,890 | $0 | $0 | $0 | $0 | $0 |
| Balance $6,866,459 | $49,690 | $4,890 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Unsecured Creditor Debt** | | | | | | | | |
| Payments | | | | | | | | |
| Balance $89,841 | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) |
| Net Cash Flow after Debt Service (P&I) | $7,574 | $7,682 | $47,818 | $52,435 | $78,558 | $52,268 | $78,296 | $52,102 |
| Prior month distribution | $0 | ($2,771) | ($7,682) | ($47,618) | ($52,435) | ($78,558) | ($52,268) | ($78,296) |
| Cash Balance (negatives to be funded from new equity) | $102,771 | $107,682 | $147,618 | $152,435 | $178,558 | $152,268 | $178,298 | $152,102 |
| **Equity** | | | | | | | | |
| Contributions (Distributions) | ($2,771) | ($7,682) | ($47,618) | ($52,435) | ($78,558) | ($52,268) | ($78,296) | ($52,102) |
| Balance | $466,451 | $458,769 | $411,151 | $358,716 | $280,158 | $227,890 | $149,594 | $97,492 |

# LAKESHORE VILLAGE / MYERS MEADOWS
## PROJECTION

| Period | 57 | 58 | 59 | Total/Avg |
|---|---|---|---|---|
| Month | 12 | 1 | 2 | |
| Period Ending | Dec-14 | Jan-15 | Feb-15 | |
| **Lakeshore Townhouse Sales** | | | | |
| **Sales** | | | | |
| Total Units Remaining | 0 | 0 | 0 | 0 |
| Total Units Sold | 18 | 18 | 18 | 18 |
| Avg. Sales Price | $247,000 | $247,000 | $247,000 | $229,833 |
| Units Sold This Period | 0 | 0 | 0 | 18 |
| Sales Revenue | $0 | $0 | $0 | $4,137,000 |
| Commissions | $0 | $0 | $0 | ($206,850) |
| Closing Cost | $0 | $0 | $0 | ($62,055) |
| Ad Valorem Taxes on Sold Units | 0 | 0 | 0 | ($48,379) |
| Net Sales Proceeds | $0 | $0 | $0 | $3,819,716 |
| **Other Income/expense** | | | | |
| Rental Income | | | | $143,200 |
| Project Overhead | 0 | 0 | 0 | ($122,000) |
| HOA Dues | 0 | 0 | 0 | ($25,925) |
| Construction costs | | | | ($156,000) |
| Ad Valorem Taxes on Inventory | 0 | 0 | 0 | ($230,004) |
| Total Expenses | $0 | $0 | $0 | ($390,729) |
| Net cash flow | $0 | $0 | $0 | $3,428,987 |
| **Lakeshore Lot Sales** | | | | |
| **Sales** | | | | |
| Total Units Remaining | 4 | 1 | - | |
| Total Units Sold | | | | 107 |
| Avg. Sales Price | $27,225 | $27,225 | $27,225 | |
| Units Sold This Period | 3 | 1 | $0 | $2,710,625 |
| Sales Revenue | $81,675 | $27,225 | $0 | $2,710,625 |
| Commissions | ($1,634) | ($545) | $0 | ($54,213) |
| Closing Cost | ($408) | ($136) | $0 | ($13,553) |
| Ad Valorem Taxes on Sold Units | ($1,579) | $0 | $0 | ($31,007) |
| Net Sales Proceeds | $78,054 | $26,544 | $0 | $2,611,853 |
| **Expenses** | | | | |
| Project Overhead | ($20) | ($5) | $0 | ($18,130) |
| Ad Valorem Taxes on Inventory | ($20) | ($2,297) | $0 | ($219,928) |
| Total Expenses | ($20) | ($2,302) | $0 | ($238,058) |
| Net cash flow | $78,034 | $24,243 | $0 | $2,373,795 |

# LAKESHORE VILLAGE / MYERS MEADOWS PROJECTION

| Period<br>Month<br>Period Ending | 57<br>12<br>Dec-14 | 58<br>1<br>Jan-15 | 59<br>2<br>Feb-15 | Total/Avg |
|---|---|---|---|---|
| **Myers Lot Sales** | | | | |
| **Sales** | | | | |
| Total Units Remaining | 0 | 0 | 0 | |
| Total Units Sold | 35 | 35 | 35 | |
| Avg. Sales Price | $52,500 | $52,500 | $52,500 | |
| Units Sold This Period | | | | 35 |
| Sales Revenue | $0 | $0 | $0 | $1,837,500 |
| Interest recovery | $0 | $0 | $0 | $221,336 |
| Property tax recovery | $0 | $0 | $0 | $19,991 |
| Roadway Impact reimbursement (25.5 lots) | $0 | $0 | $0 | $49,876 |
| Credit for earnest money deposit | $0 | $0 | $0 | ($7,500) |
| Closing Cost | $0 | $0 | $0 | ($9,188) |
| Ad Valorem Taxes on Sold Units | $0 | $0 | $0 | $0 |
| Net Sales Proceeds | $0 | $0 | $0 | $2,112,014 |
| | | | | |
| **Expenses** | | | | |
| Project Overhead | $0 | $0 | $0 | ($1,090) |
| HOA Dues | $0 | $0 | $0 | ($16,900) |
| Ad Valorem Taxes on Inventory | | | | ($17,876) |
| Total Expenses | $0 | $0 | $0 | ($34,866) |
| | | | | |
| Net cash flow | $0 | $0 | $0 | $2,077,147 |
| | | | | |
| **TOTAL NET SALE PROCEEDS** | $78,054 | $26,544 | $0 | $8,543,582 |
| **TOTAL NET CASH FLOW** | $78,034 | $24,243 | $0 | $7,879,929 |
| | | | | |
| Interest Expense - Bank Loans | $0 | $0 | $0 | $349,623 |
| | | | | |
| **Bank Loans** | | | | |
| Advances | | | | |
| Payments (85% of net proceeds of sales) | $0 | $0 | $0 | $0 |
| Balance $6,866,459 | $0 | $0 | $0 | $6,866,459 |
| | | | | |
| **Unsecured Creditor Debt** | | | | |
| Payments | | | | |
| Balance $89,841 | ($0) | ($0) | ($0) | $89,841 |
| | | | | |
| Net Cash Flow after Debt Service (P&I) | $78,034 | $24,243 | $0 | $574,006 |
| Prior month distribution | ($52,102) | ($78,034) | ($124,243) | ($574,006) |
| Cash Balance (negatives to be funded from new equit | $178,034 | $124,243 | $0 | $0 |
| | | | | |
| **Equity** | | | | |
| Contributions (Distributions) | ($78,034) | ($124,243) | $0 | ($104,785) |
| Balance | $19,458 | ($104,765) | ($104,765) | ($104,785) |